# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AREL PRICE,

*Petitioner,*

v.

STEVEDORING SERVICES OF AMERICA, INC.; EAGLE PACIFIC INSURANCE COMPANY; HOMEPORT INSURANCE CO.; DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS,

*Respondents.*

No. 08-71719

OWCP No. 07-0567

OPINION

On Petition for Review of an Order of the
Office of Workers' Compensation Programs

Argued and Submitted September 22, 2011
Submission Vacated September 29, 2011
Resubmitted August 27, 2012
San Francisco, California

Filed September 4, 2012

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Stephen Reinhardt, Diarmuid F. O'Scannlain,
Sidney R. Thomas, Barry G. Silverman, William A. Fletcher,
Ronald M. Gould, Marsha S. Berzon, Carlos T. Bea, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge O'Scannlain

**COUNSEL**

Charles Robinowitz, Attorney, Portland, Oregon, for the petitioner Arel Price.

Russell A. Metz, Attorney, Metz & Assocs. P.S., Seattle, Washington, John Randall Dudrey, Attorney, Williams Fredrickson, LLC, Portland, Oregon, Matthew W. Boyle and Mark A. Reinhalter, Counsel, LABR-U.S. Dep't of Labor, Office of the Solicitor, Washington, DC, for the respondents Stevedoring Services of America, Inc., et al.

**OPINION**

BERZON, Circuit Judge:

We consider whether a claimant under the Longshore and Harbor Workers' Compensation Act ("LHWCA," "Longshore Act," or "Act"), 33 U.S.C. § 901 et seq., (1) is entitled to the

maximum compensation rate from the fiscal year in which he becomes disabled or from the fiscal year in which he receives a formal compensation award; (2) receives interest on past due compensation at the rate defined in 28 U.S.C. § 1961 instead of the rate set forth in 26 U.S.C. § 6621;[1] and, (3) if interest is to be awarded at the § 1961 rate, whether it should be simple or compound. In the course of resolving these issues, we also consider the proper level of deference that should be accorded to the litigating position of the Director of the Office of Workers' Compensation Programs ("Director").

## I. BACKGROUND

### A. Statutory Scheme

The Longshore Act is a " 'comprehensive scheme' " to provide compensation for the disability or death of employees resulting from injuries occurring upon the navigable waters of the United States. *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1354 (2012) (quoting *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 294 (1995)); *see also* 33 U.S.C. § 903(a). Although the Department of Labor is charged with administering the Act, *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 45 (1989); 33 U.S.C. §§ 902, 939, the statute provides for a "split-function regime," in which duties are divided between two "sub-agencies," *Ingalls Shipbldg. v. Dir., OWCP*, 519 U.S. 248, 268 (1997). "By statute and by regulation, the adjudicative and enforcement/litigation functions of the Department of Labor with respect to the LHWCA are divided between the ALJ[ ]s [Administrative Law Judges] and the Benefits Review Board on the one hand, and the Director on the other." *Id.* at 269 (internal citations omitted); *see also Dir., OWCP v. Newport News Shipbldg. & Dry Dock Co.*, 514 U.S. 122, 125 (1995).

---

[1]Section 1961 delineates the interest payable on federal district court judgments. *See* 28 U.S.C. § 1961(a). In contrast, § 6621 specifies the interest rate the Internal Revenue Service ("IRS") uses with respect to the overpayment and underpayment of taxes. 26 U.S.C. § 6621(a).

When seeking compensation under the Act, a worker must file a claim with a district director, a designee of the Director. 33 U.S.C. § 919(a); 20 C.F.R. §§ 701.301(a)(7), 702.105, 702.136. With respect to benefits, the LHWCA establishes a maximum limit on compensation for disability. 33 U.S.C. § 906(b)(1). Compensation is capped at twice the applicable national average weekly wage. *Id.* The Act requires that compensation "be paid periodically, promptly, and directly to the person entitled thereto, without an award, except where liability to pay compensation is controverted by the employer." *Id.* § 914(a).

An employer controverting the right to compensation must file a formal notice with the district director. *Id.* § 914(d). Employers who do not do so become liable for an additional ten percent of "any installment of compensation payable without an award [that] is not paid within fourteen days after it becomes due." *Id.* § 914(e). In addition to and separate from any penalty due under § 914, claimants are entitled under our case law to receive interest on past due payments, regardless of whether employers have controverted liability. *See Matulic v. Dir., OWCP*, 154 F.3d 1052, 1059 (9th Cir. 1998).

District directors are authorized by the Director to resolve disputes with respect to claims and generally do so through informal discussions. 20 C.F.R. §§ 702.311, 801.2. If parties are unable to reach a resolution through this informal process, a district director will transfer the case to an ALJ for formal adjudication. *Id.* § 702.316; *see also* 33 U.S.C. § 919(d). The ALJ will then issue a compensation order rejecting a claim or making an award. 33 U.S.C. § 919(e). Parties can appeal an ALJ's order to the Benefits Review Board ("Board" or "BRB"), *id.* § 921(b)(3), and "[a]ny person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals," *id.* § 921(c).

## B.   Factual and Procedural History

Arel Price was injured in 1991 while employed as a long-shoreman by Stevedoring Services of America, Inc. After undergoing surgery for his injury, he returned to work and continued to work until 1998, when he stopped working upon his physician's advice.

After informal negotiations preceding adjudication by an ALJ, Stevedoring provided Price with weekly workers' compensation payments of $676.89 from his date of injury until January 1992. The maximum weekly compensation rate at the time of Price's injury was $699.96 per week. Price also received a lump sum payment for the period from January to November 1992.

The parties disagreed, however, as to whether the amount Stevedoring paid Price in benefits was correct, or whether the proper rate was higher. As a result, the case was referred to an ALJ, who issued a formal compensation award in 2000. Upon eventual appeal, we remanded the case for reconsideration of the national average weekly wage used to calculate Price's disability payments. *Stevedoring Servs. of Am., Inc. v. Price*, Nos. 02-71207 & 02-71578, 2004 WL 1064126, at *2-3 (9th Cir. May 11, 2004).

On remand, the ALJ revised the applicable national average weekly wage and awarded Price compensation at the 1991 fiscal year maximum, declining to apply the maximum compensation rate from fiscal year 2000, when Price received his formal compensation order. In addition, the ALJ awarded Price interest on past due payments at the rate set forth in 28 U.S.C. § 1961; the ALJ rejected Price's argument that interest should be awarded at the higher rate set forth in 26 U.S.C. § 6621(a). The ALJ also refused to award Price compound interest at the § 1961 rate, requiring only simple interest instead.[2]

_____

[2]Compound interest means "[i]nterest paid on both the principal and the previously accumulated interest." *Black's Law Dictionary* 887 (9th ed. 2009). In contrast, simple interest is "[i]nterest paid on the principal only and not on accumulated interest." *Id.*

Price appealed each of these holdings to the BRB, which affirmed the ALJ's order in its entirety.

Price then petitioned this court for review of the Board's decision, challenging the maximum rate of compensation, the rate of interest on his past due compensation, and the award of simple rather than compound interest. Price named the Director, who had not been involved in the adjudicatory proceedings before the Board, as one of the respondents. *See generally Ingalls*, 519 U.S. at 269 (holding that the Director may be named as a respondent in litigation before the courts of appeals). The Director filed a brief urging us to affirm the BRB's decision. A three-judge panel affirmed the Board's order as to all three issues, *see Price v. Stevedoring Servs. of Am.*, 627 F.3d 1145 (9th Cir. 2010), and Price petitioned for en banc review of the panel's decision. We granted the petition, in large part to address the degree of deference due the Director's litigating positions. *See id.* at 1150-51 (O'Scannlain, J., concurring).

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   *Chevron* deference

[1] Two administrative entities have weighed in on the issues here: the Board, through its order, and the Director, through his litigating position before this court. Because the Board is not a policymaking entity, we accord no special deference to its interpretation of the Longshore Act. *See Matson Terminals, Inc. v. Berg*, 279 F.3d 694, 696 (9th Cir. 2002) (citing *Potomac Elec. Power Co. v. Dir., OWCP*, 449 U.S. 268, 279 n.18 (1980)); *see also Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 154-55 (1991). The Director, by contrast, *is* a policymaking entity under the Act; he has the "power to resolve legal ambiguities in the statute." *Newport News*, 514 U.S. at 134. But having that author-

ity does not mean that *any* reasonable statutory construction by the Director is entitled to what has become known as *Chevron* deference. *See generally Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Although we have previously extended *Chevron* deference to the Director's litigating positions interpreting the Act, *see, e.g., Gilliland v. E.J. Bartells Co., Inc.*, 270 F.3d 1259, 1262 (9th Cir. 2001); *Mallott & Peterson v. Dir., OWCP*, 98 F.3d 1170, 1172 (9th Cir. 1996), we now overrule our precedent to that effect.

"[O]ur rule mandating deference to the Director's reasonable litigating positions cannot be reconciled with Supreme Court precedent." *Price*, 627 F.3d at 1150 (O'Scannlain, J., concurring). In *United States v. Mead Corp.*, the Supreme Court held that *Chevron* deference applies only when: (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law" *and* (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226-27 (2001). Whether an agency's reasonable statutory interpretation satisfies *Mead*'s second requirement depends on the form and context of that interpretation. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc). *Mead* compels us to reconsider the deference we have previously accorded the Director's statutory interpretations advanced during litigation. *See Roberts*, 132 S. Ct. at 1363 n.12 (declining to resolve whether the Director's litigating position is entitled to *Chevron* deference).

*Mead* held that tariff classification rulings by the U.S. Customs Service do not merit *Chevron* deference. 533 U.S. at 221. The relevant statute in that case provided that the Customs Service "shall, under rules and regulations prescribed by the Secretary [of the Treasury,] . . . fix the final classification and rate of duty applicable to . . . merchandise." 19 U.S.C. § 1500(b). In addition, the Secretary had promulgated regulations authorizing the Customs Service to issue "ruling letters"

setting tariff classifications for imports. *See* 19 C.F.R. § 177.8 (2000). In denying *Chevron* deference to the Service's ruling letters, *Mead* first explained, "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." 533 U.S. at 230. *Mead* then observed that the Customs Service generally issued ruling letters without any notice-and-comment procedure. *Id.* at 230-31.

Noting that the absence of any formal procedure did not *categorically* preclude extension of *Chevron* deference, the Court proceeded to examine whether there were "any other circumstances reasonably suggesting that Congress ever thought of classification rulings as deserving the deference claimed for them here." *Id.* at 231; *see also Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002). Those circumstances, it concluded, were not present. *See Mead*, 533 U.S. at 232-34. Of particular importance, the Court explained, was that the agency's regulations and practice made it clear that "a letter's binding character as a ruling stops short of third parties." *Id.* at 233. Specifically, the regulations provided that a ruling letter was to "be applied only with respect to transactions involving articles identical to the sample submitted with the ruling request or to articles whose description is identical to the description set forth in the ruling letter." 19 C.F.R. § 177.9(b)(2) (2000). Even then, a letter was "subject to modification or revocation . . . without notice to any person, except the person to whom the letter was addressed," *id.* § 177.9(c), and could usually be modified without notice and comment, *id.* § 177.10(c). The regulations, moreover, warned that "no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter." *Id.* § 177.9(c). Because the Court found no indication that the agency had "ever set out with a lawmaking pretense," *Mead*, 533 U.S at 233, it concluded that the tariff

rulings should be treated like interpretations contained in enforcement guidelines, agency manuals, and policy statements—that is, as "beyond the *Chevron* pale," *id*. at 234.

The Director's construction of the Longshore Act advanced through his litigating position falls even further "beyond the *Chevron* pale," *id*., and evinces even less of a "lawmaking pretense," *id.* at 233, than did the ruling letters in *Mead*. The Director does not adopt his litigating positions through any "relatively formal administrative procedure," *id.* at 230, but through internal decisionmaking not open to public comment or determination. *Cf. Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1339 (9th Cir. 1992) ("[L]itigation decisions are generally committed to agency discretion by law, and are not subject to judicial review under the APA."). Nor are there any other indicia that Congress intended the Director's litigating positions to "carry[ ] the force of law," *Mead*, 533 U.S. at 227. Quite the contrary. In adjudications under the Longshore Act, it is the BRB's decision, rather than the Director's litigating position, that binds the parties in any given case and provides guidance to other claimants and employers. *See* 33 U.S.C. § 921(b)(3) ("The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact . . . .").

In practice as well as theory, it is the BRB's published decisions—and not the Director's litigating positions—that are precedential and determine the rights of future parties. *See, e.g.*, *B.C. v. Stevedoring Servs. of Am.*, 41 BRBS 107, 112 (2007) ("[W]e decline to overturn our longstanding precedent that, under normal circumstances, pre-judgment interest awards under the Act should be calculated on a simple basis."). Any claimants or employers who ignore a Board precedent and rely instead on the Director's contrary litigating position—assuming there is one—do so at their own peril. Furthermore, the Director's arguments during agency adjudication inform but do not constrain the BRB's decisions in any way. In *Grant v. Portland Stevedoring Co.*, for example, the

BRB decided to adopt the 28 U.S.C. § 1961 rate for calculating interest on past due disability payments, despite the Director's position before the Board that it should rely on the 26 U.S.C. § 6621 rate. 16 BRBS 267, 270-71 (1984).

In addition, the Director's maintenance of some litigating positions that are consistent with the Board's precedential orders and others that are at odds with those orders is inconsistent with the "fairness and deliberation that should underlie a pronouncement of [law]." *Mead*, 533 U.S. at 230; *cf. Marmelejo-Campos*, 558 F.3d at 920. Returning to the previous example, the Director continued to advocate before the BRB for the § 6621 rate even *after* the Board's decision in *Grant*. *See Stone v. Newport News Shipbldg. & Dry Dock Co.*, 20 BRBS 1, at *5 (1987); *Littrell v. Oregon Shipbuilding. Co.*, 17 BRBS 84, at *2 (1985). At some point, however, the Director changed his stance to accord with the BRB's position. The agency's *Longshore Procedure Manual* now cites *Grant* for the proposition that interest on past due payments is to be paid at the § 1961 rate. *See* Div. of Longshore and Harbor Workers' Compensation, Dep't of Labor, *Longshore (DLHWC) Procedure Manual* ch. 8-201, *available at* http://www.dol.gov/owcp/dlhwc/lspm/pmtoc.htm (hereinafter *Longshore Manual*). Nonetheless, the Director has not promulgated notice-and-comment regulations that undergird his current position, although he has the authority to issue interpretive regulations and has done so with respect to other issues. *See* 33 U.S.C. § 939(a); 20 C.F.R. §§ 701.201, 701.301.

Withholding *Chevron* deference from the Director's litigating positions is consistent with the Supreme Court's decision in *Martin*, 499 U.S. 144 (1991). In *Martin*, the Court indicated that an agency's interpretation of its own regulations is not undeserving of *Chevron* deference simply because it advances that interpretation as a litigating position during administrative adjudication. *See id.* at 156-57; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988). At

first glance, *Martin* may appear to compel deference to the Director's litigating position.

"That an agency's litigating position may be entitled to deference when the agency interprets *its own regulations*," however, "says nothing about whether such a position may be entitled to deference when the agency interprets the *statute* itself." *Price*, 627 F.3d at 1150 (O'Scannlain, J., concurring) (citing *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 277-78 (2009)); *see also Gregory v. Ashcroft*, 501 U.S. 452, 485 n.3 (1991) (White, J., concurring) (noting that an agency's interpretation of a statute "is entitled to little if any deference" because "it is merely the [agency's] *litigating* position in recent lawsuits"). Significantly, *Martin* relied on the "well established" premise that substantial deference must be given to an agency's construction of its own regulations. 499 U.S. at 150. The Court "presume[d] that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Id.* at 151.

The principle that agencies' interpretations of their own regulations are entitled to deference, even when their interpretation of statutes is not, underlies *Auer v. Robbins*, in which the Court accorded *Chevron* deference to the interpretation of Fair Labor Standards Act (FLSA) regulations set forth in the Secretary of Labor's amicus brief. 519 U.S. 452 (1997). In *Auer*, the Secretary's amicus brief explained why regulations that he had promulgated gave exempt status to a class of law enforcement officers. *See id.* at 461. Deferring to that interpretation, *Auer* explained that, because the applicable test was "a creature of the Secretary's *own regulations*, his interpretation of it is . . . controlling unless 'plainly erroneous or inconsistent with the regulation.' " *Id.* (emphasis added) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). Similarly, other cases in which the Supreme

Court has deferred to agencies' litigating positions have involved interpretations of regulations, not statutes.[3]

Since *Auer*, the Court has distinguished even more clearly between an agency's informal interpretations of its own regulations and of its governing statute. In *Gonzales v. Oregon*, 546 U.S. 243, 255-58 (2006), for example, the Court held that an Interpretive Rule issued by the Attorney General was not entitled to *Chevron* deference. Notably, the government had argued that the interpretive rule was "an elaboration of one of the Attorney General's own regulations," rather than a direct interpretation of the statutory provision at issue, and was thus entitled to considerable deference under *Auer*. *Id*. at 256. Rejecting this argument, the Court explained that the underlying regulations in *Auer* "gave specificity to a statutory scheme the Secretary was charged with enforcing and reflected the considerable experience and expertise the Department of Labor had acquired over time with respect to the complexities of the Fair Labor Standards Act." *Id*. at 256-57. In contrast, the Court continued, the underlying regulation at issue did "little more than restate the terms of the statute itself. The language the interpretive rule addresses comes from Congress, not the Attorney General, and the near equivalence of the statute and regulation belies the Government's argument for *Auer* deference." *Id*. at 257. Despite the government's attempt to characterize the issue as one of *regulatory* interpretation, *Gonzales* concluded, the question was really one of *statutory* interpretation, and the interpretive rule did not merit *Auer* deference. *Id.*

---

[3]*See, e.g.*, *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2265 (2011) ("The [Federal Communications Commission] as *amicus curiae* has advanced a reasonable interpretation of its regulations, and we defer to its views."); *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1137 (2011) (relying, in part, on the Solicitor General's amicus brief to interpret a Department of Transportation regulation); *Chase Bank v. McCoy*, 131 S. Ct. 871, 880 (2011) ("Because the interpretation the [Federal Reserve] Board presents in its brief is consistent with the regulatory text, we need look no further in deciding this case.")

The rigors of rulemaking, *Gonzales* indicates, are relevant here. *Gonzales* explained that an agency does not acquire "special authority" to interpret its own regulations when it does not dedicate its "expertise and experience" to formulating those regulations and instead merely paraphrases statutory language. *Id.* In other words, an agency presumably undertakes careful deliberation about how best to effectuate statutory policies during the demanding process of promulgating regulations that go beyond simply restating a statute; through that process, it takes pains to understand and effectuate the congressional intent underlying the statute. *See Chevron*, 467 U.S. at 865 (concluding that the agency's "interpretation represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies . . . [that] Congress intended to accommodate . . . .") (footnotes omitted); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012). In addition, agencies are held accountable to the public through the formal rulemaking process. *See* 5 U.S.C. § 553 (setting forth the requirements for notice-and-comment procedure); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1097-98 (9th Cir. 2007).

Where that thorough groundwork has already been completed, the agency's later litigating positions can ordinarily be understood as resting on its earlier research and consideration.[4]

---

[4]At times, however, "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.' " *Christopher*, 132 S. Ct. at 2166 (quoting *Auer*, 519 U.S. at 462). Indicia of inadequate consideration include conflicts between the agency's current and previous interpretations, *id.*; signs that the agency's interpretation amounts to no more than a " 'convenient litigating position,' " *id.* (quoting *Bowen*, 488 U.S. at 213); or an appearance that the agency's interpretation is no more than a " '*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack,' " *id.* (quoting *Auer*, 519 U.S. at 462). Where such indicia are present, *Auer* deference is inappropriate. *See id.*

Less formality is demanded of a subsequent interpretation because the existence of regulations indicates that the agency has already weighed and reconciled, with adequate care, the conflicting policy decisions implicated in its later interpretive decision. In contrast, in the absence of formal regulations applying a statutory provision, it is more difficult to determine whether an agency's litigating position interpreting that provision is grounded in the same level of careful consideration as would be required in formal rulemaking. It is also harder to ascertain whether the agency's position takes into account the interests of the public or the parties with adequate fairness.[5] *See Mead*, 533 U.S. at 230; Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833, 886 (2001) (observing that modes of announcing agency statutory constructions other than formal regulations and adjudications "do not offer equivalent opportunities for public participation" and that "appellate or amicus briefs filed in the agency's name typically offer no established forum for public input").

Without a basis in agency regulations or other binding agency interpretations, there is usually no justification for attributing to an agency litigating position "the force of law," *Mead*, 533 U.S. at 227, essential to *Chevron* deference. An agency can ordinarily change its litigating position from one case to another, without any party having grounds to complain that doing so violates the "law." *See Didrickson*, 982 F.2d at

---

[5]Consistent with *Mead* and *Barnhart*, we have determined that some agency interpretations advanced through means other than formal rulemaking or adjudication are entitled to *Chevron* deference. *See, e.g.*, *Davis v. EPA*, 348 F.3d 772, 779 n.5 (9th Cir. 2003) ("The mere fact that the EPA engaged in informal agency adjudication of California's waiver request does not vitiate the *Chevron* deference owed to the agency's interpretation of [a Clean Air Act provision]."); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) ("*Chevron* deference is due even though HUD's Policy Statements are not the result of formal rulemaking or adjudication."). But there remains a significant gap between the "lawmaking pretense," *Mead*, 533 U.S at 233, embodied in those forms of interpretation and that manifested in an agency's litigating position.

1339 (noting that "litigation decisions are generally committed to agency discretion by law"); *cf. Bowen*, 488 U.S. at 212-13 (observing that the litigating position of the Secretary of Health and Human Services interpreting a provision of the Medicare Act was contrary to his view of that provision advocated in previous cases, and that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate").

Furthermore, deferring to agencies' litigating positions interpreting statutes they are charged with administering would create a danger that agencies would avoid promulgating regulations altogether, given the comparative ease of announcing a new statutory interpretation in a brief rather than through formal rulemaking. This result would severely undermine the notice and predictability to regulated parties that formal rulemaking is meant to promote. *See Christopher*, 132 S. Ct. at 2167. The issues in this case are illustrative: The Director could have issued notice-and-comment regulations regarding interest on compensation awards long ago, *see* 33 U.S.C. § 939(a), rather than taking inconsistent positions on interest-related issues over the years.

**[2]** Based on these considerations, we conclude that the Director's litigating position interpreting the Longshore Act does not merit *Chevron* deference. In so holding, we join all other circuits that have addressed this issue.[6]

---

[6]*See Wheeler v. Newport News Shipbuilding and Dry Dock Co.*, 637 F.3d 280, 290-91 (4th Cir. 2011) (according only *Skidmore* deference to the Director's litigating position interpreting the term "compensation" under the Longshore Act); *Day v. James Marine, Inc.*, 518 F.3d 411, 418 (6th Cir. 2008) (accepting the Director's concession that his litigating position was not entitled to *Chevron* deference, but only *Skidmore* deference); *Pool Co. v. Cooper*, 274 F.3d 173, 177 n.3 (5th Cir. 2001) ("[I]t is now clear that when the Director advances interpretations of the LHWCA in litigation briefs, such interpretations merit not *Chevron* deference, but *Skidmore* deference."); *Ala. Dry Dock & Shipbldg Corp. v. Sowell*, 933 F.2d 1561, 1563 (11th Cir. 1991) ("We owe deference to official expressions of policy by the Director, who does administer the statute, but settled law precludes us from affording deference to an agency's litigating position.") (internal citation omitted), *abrogated on other grounds by Bath Iron Works Corp. v. Dir., OWCP*, 506 U.S. 153 (1993).

Our holding finds support in the Supreme Court's analysis of the relationship between the Director and the Board under the Longshore Act. The Court has observed that the Director's "lack of control over the adjudicative process does not . . . deprive [him] of the power to resolve legal ambiguities in the statute." *Newport News*, 514 U.S. at 134. If the Director's litigating position interpreting the Act were entitled to *Chevron* deference, then the Director would have *some* control over the adjudicative process. Further, the structure of the Longshore Act suggests that participation in litigation is not one of the means through which Congress intended the Director to make legally binding pronouncements on the statute's meaning. The Director, as we have noted, "retains the rulemaking power, which means that if [his] problem with the . . . decision of the Board is that it has established an erroneous rule of law, [he] has full power to alter that rule." *Id.* (internal citations omitted).[7]

---

[7]This case does not directly involve the question whether courts must accord *Chevron* deference to agency litigating positions advanced during *agency* rather than *appellate* adjudication. In *Martin*, the Supreme Court explained that because agency litigating positions furnished at the appellate level "occur *after* agency proceedings have terminated, they do not constitute an exercise of the agency's delegated lawmaking powers" and are thus not entitled to *Chevron* deference. 499 U.S. at 156-57. In contrast, *Martin* noted, the Secretary of Labor's "interpretation of OSH Act regulations in an administrative adjudication . . . *is* agency action, not a *post hoc* rationalization of it." *Id.* at 157.

The distinction in *Martin* between administrative and court adjudication did not survive *Mead*, *Auer*, and *Auer*'s progeny, although the deference accorded the Secretary's litigating position in *Martin* is fully consistent with those cases. Notably, *Martin* involved interpretation of regulations, not a statute. Under *Auer* and its progeny, the line *Martin* drew between agency interpretations advanced during administrative versus court adjudications no longer obtains when interpretation of regulations is at issue. And, as *Martin* involved interpretation of regulations, it comports with our analysis concerning the difference between the *Chevron* deference due litigating positions interpreting statutes as opposed to regulations.

Our precedents that have relied on *Martin* to hold "that the Director's interpretation of the LHWCA is entitled to deference if it is contained . . . in the Director's litigation position within an *agency* adjudication, so long

In sum, neither the Board's decision nor the Director's litigating position interpreting the Longshore Act is entitled to *Chevron* deference.

## 2.   *Skidmore* **Deference**

Where *Chevron* is inapplicable, reasonable agency interpretations may still carry "at least some added persuasive force." *Metro. Stevedore Co.*, 521 U.S at 136. "An agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Mead*, 533 U.S. at 234 (quoting *Skidmore v. Swift*, 323 U.S. 134, 139-40 (1944)).

### i.   **The Director**

[3] The Director's interpretations of the Longshore Act may merit *Skidmore* respect, but only to the extent that they exhibit certain characteristics. "The weight of [an agency's interpretive decision] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140; *see*

as the interpretation is reasonable," *Gilliland*, 270 F.3d at 1262, have not recognized this distinction. *See also, e.g.*, *Alexander v. Dir., OWCP*, 297 F.3d 805, 807-08 (9th Cir. 2001); *Mallott*, 98 F.3d at 1172. We overrule those precedents because they granted *Chevron* deference to litigating positions interpreting a *statute* rather than *regulations*. For similar reasons, we have in our analysis treated the issue of whether to defer to the Director's litigating position as a unitary one and have drawn on *both* those cases in which the Director advanced his position before the Board *and* those cases in which he did so before this court.

*also San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 708 (9th Cir. 2012).**⁸**

**[4]** As will appear, we ultimately conclude that the Director is entitled to *Skidmore* respect as to the proper rate of interest, first because some of his arguments are persuasive and second because the agency's manual and practice have for some time consistently advanced a reasonable position as to that rate. But the Director is not entitled to *Skidmore* respect as to whether the interest should be simple or compound, because his position on that issue is simply unpersuasive, notwithstanding its inclusion in the agency's manual and the Director's consistent application of simple interest for some time. In particular, the Director's position as to compound interest is flawed because it selectively adopts the § 1961 statutory rate without adopting the accompanying provision that specifies compounding. *See* 28 U.S.C. § 1961(a), (b).

### ii.   The Board

We have previously indicated that the BRB may also be entitled to *Skidmore* respect despite its lack of policymaking authority. *See, e.g.*, *Stevedoring Servs. of Am. v. Dir., OWCP*, 297 F.3d 797, 801 (9th Cir. 2002) ("Because the Board is not a policymaking agency, its interpretation of the LHWCA is not entitled to any special deference; the court must, however, respect the Board's interpretation of the statute where such

---

**⁸**Of course, "the 'weight' assigned to *any* advocate's position is presumably dependent upon the 'thoroughness evident in its consideration' and the 'validity of its reasoning.' . . . The argument's pedigree adds nothing to the persuasive force inherent in its reasoning." Colin S. Diver, *Statutory Interpretation in the Administrative State*, 133 U. Pa. L. Rev. 549, 565 (1985) (quoting *Skidmore*, 323 U.S. at 140). For that reason, special *Skidmore* deference to agency litigating positions is more likely to turn on factors such as the consistency of its position and its application of that position through administrative practice than on the quality of its court advocacy.

interpretation is reasonable and reflects the policy underlying the statute.") (quoting *McDonald v. Dir., OWCP*, 897 F.2d 1510, 1512 (9th Cir. 1990)). This approach is in tension with *Skidmore*, which accords deference to "the Administrator under [an] Act." 323 U.S. at 140. *Skidmore* strongly suggests that it is an administrative entity's statutorily delegated authority to *administer* a statute that qualifies it for any kind of deference in the first place. And here, it is the Director, not the Board, who administers the Longshore Act. *See Ingalls*, 519 U.S. at 262-63.

In *Martin*, the Court withheld *Chevron* deference from the Occupational Safety and Health Review Commission (OSHRC) on the basis that "Congress intended to delegate to the Commission the type of nonpolicymaking adjudicatory powers typically exercised by a *court* in the agency-review context." 499 U.S. at 154. While *Martin* did not explicitly address whether OSHRC's interpretations could still be entitled to *Skidmore* respect, its observation that OSHRC essentially functions as a *court* strongly suggests that, on review in this court, OSHRC's *legal* conclusions merit no more special deference than do a district court's legal holdings. Other circuit courts have relied on *Martin* to withhold both *Chevron* and *Skidmore* deference from OSHRC. *See, e.g.*, *Chao v. OSHRC*, 540 F.3d 519, 526-27 (6th Cir. 2008); *Chao v. Russell P. Le Frois Builder, Inc*, 291 F.3d 219, 226-28 (2d Cir. 2002).

Like OSHRC, the BRB possesses only "nonpolicymaking adjudicatory powers," *Le Frois*, 291 F.3d at 227; *see also Potomac Elec.*, 449 U.S. at 279 n.18. It is therefore questionable whether the BRB should be entitled to *any* kind of special deference, however persuasive its reasoning.

Another way of approaching this problem is to return to the two-step test *Mead* set forth for determining whether an agency is entitled to *Chevron* deference. *Chevron* deference is due only when (1) "it appears that Congress delegated author-

ity to the agency generally to make rules carrying the force of law" and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226-27. Whereas the Director strikes out at step two here and receives *Skidmore* instead of *Chevron* deference to the extent that his interpretations are persuasive, the BRB strikes out at step one and therefore should probably get no special respect at all. *Cf. Le Frois*, 291 F.3d at 226 ("[W]e must first decide to which administrative actor—the Secretary or the Commission—Congress 'delegated authority . . . to make rules carrying the force of law.' Only then can we decide the nature or extent of that deference." (quoting *Mead*, 533 U.S. at 226-27)).

Nonetheless, we need not definitively resolve this conundrum concerning whether the BRB is entitled to *Skidmore* respect. As we indicate below, the Board's explanations as to the contested issues here are not persuasive and would thus not be entitled to deference in any event.

## B.   Maximum Compensation Rate

**[5]** The LHWCA caps disability benefits at twice the national average weekly wage for the fiscal year in which a worker is "newly awarded compensation." 33 U.S.C. § 906(c). The parties' disagreement over Price's maximum rate of compensation arises from their diverging interpretations of the phrase "newly awarded compensation" with respect to when compensation is awarded.

**[6]** In *Roberts v. Sea-Land Services, Inc.*, the Supreme Court recently held that an employee is "newly awarded compensation" within the meaning of § 906(c) "when he first becomes disabled and thereby becomes statutorily entitled to benefits, no matter whether, or when, a compensation order issues on his behalf." 132 S. Ct. at 1354. *Roberts* affirmed our decision in *Roberts v. Dir., OWCP*, 625 F.3d 1204, 1207 (2010), on which the three-judge panel in this case relied in

agreeing with Respondents' position. *See Price*, 627 F.3d at 1148. The Supreme Court's holding in *Roberts* is dispositive. We therefore affirm the BRB's determination that the ALJ properly applied the maximum rate of compensation for 1991, when Price became disabled.

## C.  Interest Rate

We have held that interest on disability awards is mandatory under the LHWCA as a " 'necessary and inherent component of 'compensation' because it ensures that the delay in payment of compensation does not diminish the amount of compensation to which the employee is entitled.' " *Matulic*, 154 F.3d at 1059 (quoting *Sproull v. Dir., OWCP*, 86 F.3d 895, 900 (9th Cir. 1996)). We have extended this principle to "pre-judgment" interest, which in the LHWCA context means interest that accrues from the date a worker becomes entitled to compensation, rather than from the date of an ALJ's award. *See id.* (citing *Hunt v. Dir., OWCP*, 999 F.2d 419, 421-22 (9th Cir. 1993)). As discussed, the date that a worker becomes statutorily entitled to compensation is when he first becomes disabled. *See Roberts*, 132 S. Ct. at 1356.

**[7]** While the parties agree that Price should receive interest on his past due benefits, they disagree as to the proper rate of interest. The LHWCA contains no express provision regarding interest on past due compensation, nor any standards for calculating the rate of interest to be awarded.[9] *Found. Constructors, Inc. v. Dir., OWCP*, 950 F.2d 621, 625 (9th Cir. 1991).

### 1.  Section 6621 or Section 1961

**[8]** Price first argues that the ALJ should have awarded him interest on past due compensation at the rate set forth in

---

[9]Nonetheless, all the parties have treated the interest rate issues in this case as questions of statutory interpretation. We therefore do so as well.

26 U.S.C. § 6621. Section 6621 defines the interest rate that the IRS uses with respect to compensation for overpayment and underpayment of taxes. *See* 26 U.S.C. § 6621(a). This rate is the federal "short-term rate"[10] plus three percentage points. *See id.* The Director and other Respondents contend, in contrast, that the ALJ properly awarded Price interest at the rate set forth in 28 U.S.C. § 1961. Section 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a). The § 6621 rate is always higher than the § 1961 rate. *Compare* United States District Court, District of Utah, *Post-Judgment Interest Rates*, http://www.utd.uscourts. gov/documents/judgpage.html (last visited June 19, 2012) (documenting the § 1961 rate from 1994 to 2012), *with* IRS, *Internal Revenue Bulletin: 2008-52* (Dec. 29, 2008), *available at* http://www.irs.gov/irb/2008-52_IRB/ar07.html#d0e169 (tracking the § 6621 rate from 1975 to 2009).

As an initial matter, we are unpersuaded by the BRB's reasons for applying the § 1961 rate rather than the § 6621 rate. The BRB settled on the § 1961 rate in *Grant v. Portland Stevedoring Co.*, 16 BRBS 267 (1984), and has since consistently used that rate. *See B.C. v. Stevedoring*, 41 BRBS at 111. In *Grant*, the Board held that interest on past-due compensation for injured workers should be awarded at the § 1961 rate rather than at a fixed rate of six-percent, 16 BRBS at 270, which was the rate that the IRS had used to calculate interest on tax overpayments and underpayments *prior to* amendments of the Internal Revenue Code in 1975. *See* S. Rep. 93-1357, at 7494-97 (1974). It reasoned that the six-percent rate "does not take into account . . . economic trends and is therefore no longer appropriate to further the purpose of making

---

[10]The federal short-term rate is "the rate determined by the [IRS] Secretary based on the average market yield . . . on outstanding marketable obligations of the United States with remaining periods to maturity of 3 years or less." 26 U.S.C. § 1274(d)(1)(C)(i).

the claimant whole." *Grant*, 16 BRBS at 270. In contrast, the BRB explained, the § 1961 "rate is periodically changed to reflect the yield on United States Treasury Bills, and thus more accurately reflects the actual loss to claimant due to the employer's use of claimant's past due benefits." *Id.*

The same, however, could *also* be said of the current § 6621 rate. Because the § 6621 rate is now tied to the "federal short-term rate," 26 U.S.C. § 6621(a), it also fluctuates in accordance with changing economic conditions. Indeed, Congress abandoned its previous application of a flat six-percent interest rate to tax overpayments and underpayments precisely because the fixed rate could not be "kept in line with [changing] money market rates." S. Rep. 93-1357, at 7496. Thus, although the BRB's reasoning justifies applying the § 1961 rate instead of a flat rate, it does nothing to establish the propriety of the § 1961 rate over the § 6621 rate.

*Grant* advanced a second rationale for adopting the § 1961 rate instead of the amended § 6621 rate, on which the Director relies: The § 1961 rate comports with past procedures for administering the LHWCA. *See* 16 BRBS at 271. Specifically, *Grant* noted that before Congress amended the Act in 1972, deputy commissioners had the authority to adjudicate compensation claims, and their decisions were appealed to the federal district courts. *Id.* Following the 1972 amendments, ALJs took over the adjudicatory functions of the deputy commissioners. *Id.* ALJ decisions are now appealed to the BRB, and the Board's decisions, in turn, are reviewed by the federal circuit courts. *Id.* Based on this history, the Board concluded that it had assumed the role formerly exercised by district courts in adjudicating claims under the Act, and that its orders have the "force and effect" of federal judgments. *Id.* It therefore endorsed the § 1961 rate, which is used to calculate interest payments on district court judgments. *Id.*

The BRB's reasoning, however, is now undermined by the Supreme Court's decision in *Roberts* and by the Board's own

position on the issue decided in that case. *See* 132 S. Ct. at 1355. Interest on payments accrues as of a claimant's date of injury rather than the date of a Board order. *Id.* at 1363. But § 1961 sets forth the *post*-judgment interest to be paid in civil cases. *See* 28 U.S.C. § 1961(a). Under the compensation rate rule approved in *Roberts*, the interest due to claimants is more appropriately analogized to *pre*-judgment interest. *See also Matulic*, 154 F.3d at 1059 (reaching the same conclusion prior to *Roberts*). The Board's explanation also fails to take into account "the many cases in which no formal orders issue, because employers make voluntary payments or the parties reach informal settlements." *Roberts*, 132 S. Ct. at 1358.

We are likewise unconvinced by the Director's argument in his briefs before us that § 914, which requires additional compensation for overdue payments, ensures that claimants will not be under-compensated and thus renders the higher § 6621 rate unnecessary. Section 914(e) imposes a ten percent penalty on late payments that are due without a compensation order. *See* 33 U.S.C. § 914(e). But this provision applies *only* when an employer fails to timely file a notice of controversion. *See id.* § 914 (d), (e). The Director concedes that Price is not entitled to any additional compensation pursuant to § 914, because Stevedoring Services filed a timely notice of controversion. Section 914 is nevertheless relevant, the Director insists, because it impels employers quickly to notify the OWCP of their intention not to pay compensation voluntarily for alleged injuries. Once an employer has done so, the Director maintains, "[t]he claimant can then promptly invoke the Longshore Act's dispute resolution procedures — procedures designed to resolve disputes quickly and informally." According to the Director, the likelihood that parties will quickly resolve disputes over compensation obviates the need for the higher interest rates advocated by Price.

But this case—like others in which the rate of interest is likely to matter —was resolved neither quickly nor informally. Although Stevedoring Services filed a notice of con-

troversion in 1992, Price did not receive a formal compensation order until 2000. The existence of § 914 thus does little to bolster the Director's position that Price, and others in his position, should be awarded interest at the lower § 1961 rate.

**[9]** Nonetheless, we conclude that applying the § 1961 rate is most appropriate here. To begin, our precedents support the reasonableness of that rate. We have concluded, in the maritime context, "that the measure of interest rates prescribed for post-judgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest." *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). Comparison with the maritime context is appropriate because pre-judgment interest there serves the same purpose as it does here. As discussed, interest on disability is an essential part of compensation under the Longshore Act, " 'because it ensures that the delay in payment of compensation does not diminish the amount of compensation to which the employee is entitled.' " *Matulic*, 154 F.3d at 1059 (quoting *Sproull*, 86 F.3d at 900). In adopting the § 1961 rate in *Western Pacific Fisheries*, we similarly explained that "[a]n award of pre-judgment interest at below market rates does not fully compensate the prevailing party and, in addition, tends to . . . give[ ] an economic benefit to the debtor." 730 F.2d at 1288. The clear implication of our explanation was that the § 1961 rate *does* reflect market rates and thereby "fully compensate[s]" aggrieved parties. *Id.*

**[10]** We have also applied the § 1961 rate to prejudgment interest on awards under ERISA. *See Blanton v. Anzalone*, 813 F.2d 1574, 1576 (9th Cir. 1987). ERISA, like the Longshore Act, has a remedial purpose, and both schemes provide payments on which recipients are likely to depend, in whole or in part, for their livelihood. *Compare Honolulu Joint Apprenticeship and Training Comm. of United Ass'n Local Union No. 675 v. Foster*, 332 F.3d 1234, 1239 (9th Cir. 2003) (recognizing the "remedial purpose of ERISA in favor of par-

ticipants and beneficiaries"), *with Found. Constructors*, 950 F.2d at 625 (emphasizing "the remedial intent of the [Long-shore] Act"). Our view that the § 1961 rate is adequate to effectuate the remedial purpose of ERISA supports the propriety of applying that rate under the Longshore Act.

For similar reasons, we have acquiesced to the application of the § 1961 rate with respect to pre-judgment interest in Title VII back pay cases. *See, e.g.*, *Estate of Reynolds v. Martin*, 985 F.2d 470, 472 (9th Cir. 1993); *see also Saulpaugh v. Monroe Cmty Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993); *cf. Ford v. Alfaro*, 785 F.2d 835, 842-43 (9th Cir. 1986). "An award of back pay is appropriate to advance Congress' intent to make persons whole for injuries suffered through past discrimination." *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000) (internal quotation marks omitted). Insofar as interest at the § 1961 rate ensures that individuals are adequately compensated for lost employment opportunities due to discrimination, so too should it ensure that workers are sufficiently compensated for lost job opportunities due to disability.

Pointing to another remedial scheme, Price contends that use of the § 6621 rate under the Black Lung Benefits Act ("Black Lung Act") compels application of the same rate under the Longshore Act. The Black Lung Act is also administered by the Director, 30 U.S.C. § 936(a); 20 C.F.R. § 726.6, and provides benefits for the death or disability of coal miners resulting from the "black lung disease," *see* 30 U.S.C. § 901. One attribute of the Black Lung Act is of particular importance in weakening the analogy to the Longshore Act for purposes of determining the appropriate rate of interest: Although "[s]ignificant portions of the Longshore Act have been incorporated unchanged in the Black Lung Benefits Act," *Nealon v. Cal. Stevedore & Ballast Co.*, 996 F.2d 966, 970 (9th Cir. 1993),[11] the Black Lung Act and its implementing regulations,

---

[11]*See* 30 U.S.C. § 932(a) (adopting parts of the Longshore Act "except as otherwise provided . . . by regulations of the Secretary [of Labor]").

unlike the Longshore Act and its implementing regulations, expressly apply the § 6621 rate to interest due on late payments. *See* 30 U.S.C. § 934(b)(1)(5)(B); 20 C.F.R. § 725.608(d)(3). As the Director persuasively argues, the absence of a comparable provision mandating application of the § 6621 rate under the Longshore Act—despite the parallelism of many other aspects of the two statutes—undercuts any inference that the Black Lung Act's incorporation of § 6621 has application by analogy here.

Furthermore, there are reasons for applying § 6621 that are unique to the Black Lung Act. The Director notes that "like unpaid taxes under section 6621, the [Black Lung Act] is concerned with interest on debts *to the United States government*." (emphasis added). Specifically, payments under the Black Lung Act are sometimes made from the Black Lung Disability Trust Fund ("Trust Fund"). *See* 26 U.S.C. § 9501; 20 C.F.R. § 725.1. When those payments are later determined to be the liability of a mine operator, *see* 20 C.F.R. § 725.602, the operator is required to repay the Trust Fund with interest at the § 6621 rate. *See* 30 U.S.C. § 934(b)(1)(5)(B). Significantly, the Trust Fund was created as part of the Internal Revenue Code and is funded through tax receipts. 26 U.S.C. § 9501(b)(1). Operators' repayments to the Trust Fund are thus considered obligations to the United States, 30 U.S.C. § 934(b)(1), and liens that automatically arise when the Trust Fund pays claimants on behalf of an operator "shall be treated in the same manner as a lien for taxes due and owing to the United States" in any bankruptcy or insolvency proceeding. *Id.* § 934(b)(3)(B).

As these statutory provisions make clear, Congress explicitly recognized the similarity between the obligations of mine operators to the Trust Fund and that of taxpayers to the United States. In contrast, although the Longshore Act also establishes a "special fund," 33 U.S.C. § 918, the money in the fund "shall not be money or property of the United States," *id*. § 944(a).

It is true that the Black Lung Act's implementing regulations also apply the § 6621 rate to interest on late payments made directly to miners. *See* 20 C.F.R. § 725.608(d)(3). However, we find convincing the Director's argument that this arrangement "is reasonable because it makes all interest calculations under the Black Lung Benefits Act consistent and therefore easier to administer." Accordingly, that employers pay interest on late payments to claimants at the § 6621 rate under the Black Lung Act does not militate in favor of applying that rate under the Longshore Act, despite the many other similarities between the two statutory schemes.

We acknowledge that there are also significant reasons favoring the § 6621 rate. Ensuring "certain, prompt recovery for employees" is a "central" purpose of the Longshore Act. *Roberts*, 132 S. Ct. at 1354. In its context of origin, the § 6621 rate has a parallel purpose of encouraging prompt payment of taxes and prompt return of tax overpayments.

The 1975 amendments to the tax underpayment rate, abandoning the flat six-percent rate in favor of the predecessor to the current rate of three percentage points plus the short-term rate, were largely motivated by a "trend in taxpayer postponement of tax payments." S. Rep. 93-1357, at 7496. Due to changing economic conditions, the six-percent underpayment rate in effect at the time had fallen below the money market interest rate. *See id.* at 7495. The underpayment rate thus "no longer serve[d] the purposes for which it was originally intended" insofar as "[a]n increasing number of taxpayers [were] finding it more profitable to 'borrow' tax funds at the present 6 percent rate rather than paying their taxes when due, and rather than using their own funds or borrowing funds at prevailing commercial rates." *Id.* at 7496. A similar trend applied to tax overpayments: Because the government had to pay more than six-percent interest to bondholders, it could "borrow" money more cheaply from taxpayers by delaying refunds of tax overpayments; "the incentive to make refunds promptly [was] no longer operative." *Id.* Taxpayers who

received six-percent interest on their overpayments were, in turn, not "receiving the value [they] could obtain by the use of [their] own funds." *Id*. In light of these circumstances, Congress amended the tax underpayment rate to induce prompt payments by taxpayers, and it amended the tax overpayment rate to induce prompt refunds by the government. Insofar as interest is meant to facilitate prompt payments under both the Internal Revenue Code and the Longshore Act, applying the § 6621 rate could be apposite here.

At the same time, both § 1961 and § 6621 only *approximate* how much prompt payments would be worth to the respective "creditors" under those provisions (i.e., winners of district court money judgments in the § 1961 context; the government in the § 6621 underpayment context; and individuals who have overpaid their taxes in the § 6621 overpayment context). In the Longshore Act context, it is impossible to ascertain how much prompt payments would be worth to claimants, because it is impossible to know what they would have done with the money had they received it on time. Section 1961 approximates the value of prompt payments to prevailing parties by assuming that they would have invested the money and earned interest at the 52-week Treasury rate (or avoided borrowing money and paying interest at that rate). *See* 28 U.S.C. § 1961(a). Section 6621 approximates the value of prompt payments to the government and individuals who overpaid their taxes by assuming that these parties would have invested the money and earned interest at a rate equivalent to three percentage points above the federal short-term rate (or avoided borrowing money and paying interest at that rate). *See* 26 U.S.C. § 6621(a). *Both* provisions provide reasonable proxies.

Because Congress has not expressed an intent on the matter and the considerations favoring adoption of one statutory rate versus the other are in near equipoise, whether the § 1961 or § 6621 rate *better* approximates the value of prompt payments to claimants is in large part a policy determination best left to

the agency. Here, the agency has expressed a preference for the § 1961 rate, as reflected in the Director's assertion in his brief that he has consistently applied that rate for at least twenty years, following the BRB's decision in *Grant*, 16 BRBS 267. The Director's assertion is substantiated by incorporation of the § 1961 rate into the Longshore Manual. *See Longshore Manual* ch. 8-201. Ultimately, "[t]he agency's interpretive position . . . provides a reasonable alternative that is consistent with the statutory framework. No clearer alternatives are within our authority or expertise to adopt; and so deference to the agency is appropriate under *Skidmore*." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 401-02 (2008); *see also Tablada v. Thomas*, 533 F.3d 800, 808 (9th Cir. 2008) (deferring to the agency's reasonable interpretation of a statute rather than the petitioner's "reasonable alternative interpretation," because the agency had "consistently implemented its policy" for over twenty years).

**[11]** In light of the forgoing, we hold that § 1961, not § 6621, is to be used to calculate interest on past due payments under the Longshore Act.[12]

## 2.   Simple or compound interest

Price next argues that he should be awarded compound interest on past due compensation, especially if this court upholds application of the § 1961 rate. We agree.

**[12]** A "central" purpose of the Longshore Act is to ensure "certain, prompt recovery for employees." *Roberts*, 132 S. Ct. at 1354. The language and structure of the Act demonstrate a clear congressional intent that compensation be paid in a timely manner. Section 914 states, for example, that "[c]ompensation under this chapter *shall* be paid periodically,

---

[12]Should the Director consider altering his position, however, our holding does not preclude him from adopting the § 6621 rate through the formal rulemaking process or other appropriate means.

promptly, and directly to the person entitled thereto without an award, except where liability to pay compensation is controverted by the employer." 33 U.S.C. § 914(a) (emphasis added). In addition, as we have seen, employers who controvert the right to compensation must file a notice with the deputy commissioner within fourteen days of learning of the alleged death or injury or otherwise pay a penalty. *See id.* § 914 (d), (e).

The Longshore Act's emphasis on timely payments reflects an understanding that "a dollar tomorrow is not worth as much as a dollar today," when the injured worker could consume or invest it. *Found. Constructors*, 950 F.2d at 625. The Act's interlocking provisions facilitating prompt payments thus furnish compelling evidence that Congress intended claimants to receive the *full value* of the compensation to which they are entitled. *See* 33 U.S.C. § 914. Although we have previously recognized that "[a]llowing an employer to delay compensation payments interest-free would reduce the worth of such payments to the claimant, undermining the remedial intent of the Act," *Found. Constructors*, 950 F.2d at 625, we have never decided what kind of interest—simple or compound—would be sufficient to effectuate that purpose.

**[13]** We conclude that simple interest *at the § 1961 rate* is insufficient to effectuate the purpose of awarding interest under the Longshore Act. Section § 1961(a) uses the interest rate applied to Treasury bonds. "[B]ecause Treasury bonds have very little risk," they have "a correspondingly low rate of return." *Fry v. Exelon Corp. Cash Balance Pension Plan*, 571 F.3d 644, 646 (7th Cir. 2009); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 437 (7th Cir. 1989) (characterizing the § 1961 rate as "too low"). That simple interest at the Treasury bond rate is inadequate alone to compensate parties for the decrease in a judgment's value over time is reflected in § 1961 itself. Subsection (b) of that provision requires that interest "shall be compounded annually." 28 U.S.C. § 1961(b). Because the subsections of § 1961 work

*together* to ensure that parties receive the money to which they are entitled, it is unreasonable for the Board to apply the § 1961(a) interest rate but to refuse to compound the resultant interest pursuant to § 1961(b).[13]

It is true, as the Director argues, that § 1961 requires compounding only of *post*-judgment interest. But that is a distinction that carries no significance here. The Supreme Court has indicated that formal judgments are not what determine a claimant's entitlement to compensation under the Longshore Act. *See Roberts*, 132 S. Ct. 1350. The Court observed in *Roberts* that many pending claims under the Longshore Act are settled through voluntary payments without a formal order. *See id.* at 1355. Individuals who receive compensation without a formal order are no less entitled to compensation than those who receive compensation via a formal order. It would thus be arbitrary, and disruptive to the uniform administration of the statute, to deny compound interest only to workers who have settled their claims through informal means. *See also id*. at 1358 ("Construing any workers' compensation regime to encourage gratuitous confrontation between employers and employees strikes us as unsound.").

The BRB's published decisions provide three reasons for not compounding interest on past-due payments awarded at the § 1961(a) rate, none of which we find persuasive.[14] First, in *Santos*, the Board reasoned that "[a]lthough Section 1961 has provided guidance as to interest rate, it does not expressly authorize compounding interest in cases under the Act." 22 BRBS at 228. But, of course, the Act does not explicitly authorize *using* the § 1961(a) rate in the first place; for that matter, the Act does not explicitly authorize the application of *any* particular interest rate. So the fact that § 1961 applies to

---

[13]Price points out that the § 6621 rate is higher than the § 1961 rate even when the latter is compounded.

[14]Because the BRB's reasoning is not persuasive, we need not and thus do not address whether the BRB is entitled to *Skidmore* deference.

the Act only by analogy is not a reason for bifurcating a single approximation of the time value of money by adopting part but not all of it.

Next, the Board has relied on the proposition that it is the "general American rule" to award simple rather than compound interest. *Santos*, BRBS at 228 (citing *Stovall v. Ill. Cent. Gulf R.R. Co.*, 722 F.2d 190, 192 (5th Cir. 1984) ("[W]hen interest is allowable, it is to be computed on a simple rather than compound basis in the absence of express authorization otherwise.")). Many courts have begun, however, to move away from this rule.[15]

The growing recognition that compound interest can be necessary to compensate plaintiffs fully is justified by changing economic realities. The Eighth Circuit has explained:

---

[15]*See, e.g.*, *Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 938 (7th Cir. 2003) ("We believe that, absent special circumstances, compound, not simple, interest ought to be awarded in Carmack Amendment cases."); *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1116 (7th Cir. 1998) ("It is, of course, settled in the case law that compounding of pre-judgment interest is acceptable."); *EEOC*, 80 F.3d at 1098 (affirming trial court's assessment of compound pre-judgment interest on state troopers' back pay award and emphasizing that compound interest should "ordinarily" be awarded on back pay); *Sands v. Runyon*, 28 F.3d 1323, 1328 (2d Cir. 1994) (holding that the postal service violated the Rehabilitation Act by refusing to hire a disabled worker and that the district court abused its discretion in not awarding back pay with compound pre-judgment interest); *Gorenstein*, 874 F.2d at 437 (affirming an award of compound pre-judgment interest under the Lanham Act and criticizing the treasury rate of § 1961 as being "too low"); *Saulpaugh*, 4 F.3d at 145 (explaining, in the context of Title VII, that "[g]iven that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded"); *Todd Shipyards Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985) (affirming an award of compound pre-judgment interest in the admiralty context); *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1510 n.1 (Fed. Cir. 1984) (upholding, in the patent context, a district court award that included compound pre-judgment interest).

> [The] common law presumption against compound interest stemmed from a historical view that interest upon interest was "iniquitous and against public policy." *Whitcomb v. Harris*, 38 A.138, 140 (1897). Courts did not wish to "hasten[ ] the accumulation of debt," *Abramowitz v. Washington Cemetery Ass'n*, 51 A.2d 461, 463 (N.J. Ch. 1947), and "sought to prevent an accumulation of compound interest in favor of negligent creditors who did not collect their interest when it became due." *State ex rel. Nw. Mut. Life Ins. Co. v. Bland*, 189 S.W.2d 542, 548 (1945).

*Am. Milling Co. v. Brennan Marine, Inc.*, 623 F.3d 1221, 1227 (8th Cir. 2010).[16]

As the circumstances of Longshore Act claimants illustrate, the concern about "negligent creditors" has considerably less application in many of the situations in which compounding pre-judgment interest now arises. Although the Director argues that simple interest "reflects an amount a claimant could have realistically earned on the money had it been timely paid," this assertion defies reality. Anyone with a savings account, credit card, mortgage, or student loan knows that the modern financial world employs compound interest as a general rule. In addition, injured stevedores, dockhands, and other longshore workers surviving off of disability payments but unable to collect them because of employer contravention until long after the injury occurred hardly fit the profile of "negligent creditors." *Id*. (internal quotation marks omitted). If anything, disabled workers struggling to make ends meet

---

[16]Even more pernicious than "negligent creditors," in the eyes of the common law, were those who intentionally reaped the gains of interest upon interest. *See* Charles Dickens, *Bleak House* 332-33 (Penguin Books 1996) (1853) (describing the great-grandfather of a greedy moneylender as a "horny-skinned, two-legged, money-getting species of spider who spun webs to catch unwary flies and retired into holes until they were entrapped" and asserting that "[t]he name of this old pagan's god was Compound Interest").

have more to lose than to gain from delays in their compensation payments, and are more likely to encounter those delays not because of their own lassitude but because of the opportunities available to employers under the Act's administrative scheme for putting off payment until a final adjudication.

Consistent with these observations, the movement in the case law away from the "American rule" against compounding pre-judgment interest reflects a growing consensus that the attitudes underlying the common law presumption are being displaced by the modern recognition that compound interest fosters fairness and efficiency. Modern commentators recognize that

> [w]ith simple interest, the plaintiff is not fully compensated and the defendant does not fully pay for the harm caused. As a result, simple interest underdeters the defendant and overdeters the plaintiff from engaging in the activity that produced the harm. In addition, simple interest encourages the defendant to drag on legal proceedings.

Michael S. Knoll, *A Primer on Prejudgment Interest*, 75 Tex. L. Rev. 293, 308 (1996).[17]

Oliver Wendell Holmes once observed

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long

---

[17]*See also* David S. Reid, *Dissenters' Rights: An Analysis Exposing the Judicial Myth of Awarding Only Simple Interest*, 36 Ariz. L. Rev. 515, 523 (1994) ("If the use of interest is not paid for by the borrower, the borrower will effectively receive a "free loan" of that interest. . . . The lender can only be compensated for this cost by computing interest on the interest already owed, and this is accomplished through the use of compound interest.").

>since, and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897). That it is the "longstanding precedent," *B.C. v. Stevedoring*, 41 BRBS at 112, of the BRB to apply simple interest is not, without more, an adequate reason to sustain that practice.

Finally, in *B.C. v. Stevedoring*, the Board asserted that claimants should receive simple interest on pre-judgment interest awards "under normal circumstances," 41 BRBS at 112, suggesting that there are circumstances in which compound interest is available. Although the BRB has never explained in a published order what it means by "normal circumstances," there is one unpublished order in which the Board alludes to circumstances meriting compound interest. *See Harris v. Machinists, Inc. and Travelers Ins. Co.*, BRB No. 99-0305, 1999 WL 35136833 (BRB Dec. 7, 1999). *Harris* explained that "[c]ompound interest in cases has been allowed where the conduct of the party owing the interest has been egregious, *i.e.*, an intentional patent or trademark infringement, and it has been found to be 'particularly appropriate where violation was intentional and indeed outrageous.' " *Id*. at *2 (quoting *Gorenstein*, 874 F.2d at 436). Under *Harris*'s logic, compound interest may be levied only as a *punitive* measure.

This essentially punitive standard for awarding compound interest is inconsistent with the general justification for compounding pre-judgment interest in the first place. As discussed, interest is awarded on past due payments to ensure that claimants receive the compensation to which they are entitled; waiting for money is costly to the injured worker. In other words, "prejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 197 (1995); *accord In re Oil Spill*, 954 F.2d 1279, 1331-32

(7th Cir. 1992). Such interest compensates a claimant, who has been rendered an "involuntary creditor," *id.* at 1331, by the employer's delay. As we have indicated, courts have increasingly recognized that "[c]ompound interest generally more fully compensates a plaintiff," *Am. Nat. Fire Ins. Co.*, 325 F.3d at 938, especially when the interest rate is low, as it is under § 1961; there is no element of penalty or punishment in the justification for compound interest. We are thus unconvinced by the Board's explanation that simple interest should be awarded absent exceptional circumstances.

For similar reasons, we are also unpersuaded by the Director's argument that "full compensation is ensured by simple interest and the additional compensation available under section 14." Section 914 provides for a "delinquency penalty," *Roberts*, 132 S. Ct. at 1359 n.6; 33 U.S.C. § 914, and thus advances a punitive goal separate from the purpose of ensuring full compensation. Moreover, § 914 applies only where employers have not controverted liability. *See* 33 U.S.C. § 914(e).

**[14]** Keeping in mind "the humanitarian purposes of the LHWCA" and "our mandate to construe broadly its provisions so as to favor claimants in the resolution of benefits cases," *Matulic*, 154 F.3d at 1057, we hold that the Board erred in awarding Price simple interest on his past due payments at the § 1961 rate.

\*\*\*

**[15]** We affirm the Board's order as to Price's maximum compensation rate, reverse as to the interest rate on his past due payments, and remand for the agency to calculate the proper award of interest at a rate no lower than the compound § 1961 rate.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting in part:

I agree with the majority that the Director's litigating position before this court is not entitled to *Chevron* deference and that the proper rate of interest on past-due compensation awards under the Longshore and Harbor Workers' Compensation Act (LHWCA) is the rate set forth in 28 U.S.C. § 1961(a). That said, I cannot join the majority's discussion of these issues because, in my view, it treats several matters that are unnecessary to the outcome of this case and thus should be left for another day. *See, e.g.*, Op. at 10460-61 n.7 (discussing whether litigating positions taken in agency adjudications are entitled to *Chevron* deference); Op. at 10462-64 (discussing whether the position of the Benefits Review Board is entitled to deference).

More specifically, I disagree with the majority's conclusion that the Director of the Office of Workers' Compensation Programs is not entitled to deference with respect to the method of computing interest and, therefore, I respectfully dissent from the majority's conclusion to the contrary.

I

In applying the LHWCA, the Director has long taken the position that interest on past-due compensation awards should be computed on a simple basis. That position accords with the general rule of awarding only simple interest when a statute does not expressly require otherwise; it aligns with the consistent position taken by the Benefits Review Board since 1989, *see Santos v. General Dynamics Corp.*, 22 BRBS 226 (1989); and it is consistent with the LHWCA, which is silent on the rate and computation of interest. Nor is the Director's position a novel litigating position; it has been embodied in the Longshore Procedure Manual, used by district directors nationwide, since at least 1989. *See* Div. of Longshore and Harbor Workers' Compensation, Dep't of Labor, *Longshore Proce-*

*dure Manual*, ch. 8-201, *available at* http://www.dol.gov/owcp/dlhwc/lspm/pmtoc.htm.

Given these features, in my view the Director's position, though informal, is persuasive enough to merit our respect. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting consistency, thorough consideration, and valid reasoning as factors contributing to persuasiveness). We should defer to the agency's consistent, long-standing implementation of simple interest. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399-401 (2008) (deferring under *Skidmore* to an informal agency interpretation because it was consistent with the agency's responsibilities and had bound staff members for over five years); *Tablada v. Thomas*, 533 F.3d 800, 806-08 (9th Cir. 2008) ("[T]he consistent and even application of the [agency's] methodology promulgated in [its] Program Statement . . . since 1992 convinces us that we must accord deference to the [agency's] interpretation.").

A

To reach the contrary conclusion, the majority emphasizes the LHWCA's remedial purpose and a growing trend toward the use of compound interest. With respect, the majority's analysis is unpersuasive.

The majority first contends that simple interest does not fulfill the LHWCA's purpose of fully compensating claimants. But fully compensating employees is not the Act's only purpose. *See Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1354 (2012). Rather, "the LHWCA represents a compromise between the competing interests of disabled laborers and their employers, [so] it is not correct to interpret the Act as guaranteeing a completely adequate remedy for all covered disabilities." *Dir., OWCP v. Newport News Shipbldg. and Dry Dock Co.*, 514 U.S. 122, 131 (1995) (internal quotation marks omitted). The Act is not meant always to provide a "complete remedy," but aims instead to ensure that workers receive *some*

compensation for injuries, even if it is not "complete compensation for the wage earner's economic loss." *Potomac Electric Power Co. v. Dir., OWCP*, 449 U.S. 268, 281 (1980).

We must therefore consider the Director's position in light of the bargain the Act represents, rather than treating the Act's remedial purpose as an unbeatable trump. In this vein, the Supreme Court has cautioned against "add[ing] features that will achieve statutory 'purposes' more effectively." *Newport News*, 514 U.S. at 136. Whatever our views on the effectiveness of simple interest in compensating claimants, we should not add a compounding requirement to the statutory scheme just because we think it would better serve the Act's remedial purpose. *See id.* at 135-36; *Potomac Electric*, 449 U.S. at 280-81.

## B

The majority contends next that compound interest is warranted based on "changing economic realities" and a "growing recognition" that compound interest might more fully compensate plaintiffs. Op. at 10477. This too is not reason enough to reject the Director's position. The Supreme Court has cautioned that a growing trend—even one that is "sound as a matter of policy" and is now a dominant view—is an insufficient basis for abandoning a settled rule. *Potomac Electric*, 449 U.S. at 279-80 & n.20.

Whatever the "growing consensus," op. at 10479, the Director, as administrator of the Act, is best positioned to evaluate changing circumstances and to determine whether simple interest continues to provide adequate compensation to claimants.[1] Where the Act is silent and the agency has made

---

[1]In reading the majority's opinion, one might think that the Director is an adversary of claimants who seek to receive their full entitlement. To the contrary, the Director often intervenes in lawsuits seeking interpretations or compensation more favorable to the employee than what the employee received from the Board. *See, e.g.*, *Ingalls Shipbldg., Inc. v. Dir., OWCP*, 519 U.S. 248, 253 (1997); *Stevedoring Servs. of Am. v. Dir., OWCP*, 297 F.3d 797, 801 (9th Cir. 2002); *McDonald v. Dir., OWCP*, 897 F.2d 1510, 1511 n.2 (9th Cir. 1990).

a reasonable choice, we should not inject our policy views into the Act's provisions.

## C

The majority also faults the Director for adopting the rate set forth in section 1961(a) while not adopting section 1961(b)'s compound interest component. Again, the Director's decision is reasonable. The Director has concluded that section 1961 provides useful guidance; that conclusion should not force the Director to swallow section 1961 whole. And by declining to adopt the section 1961(b) formulation, the Director has honored the general rule that simple interest applies unless a statute expressly authorizes compound interest. *See, e.g.*, *Cherokee Nation v. United States*, 270 U.S. 476, 490-91 (1926); *Stovall v. Ill. Cent. Gulf. R.R. Co.*, 722 F.2d 190, 192 (5th Cir. 1984). Because the LHWCA does not expressly authorize interest awards, it is reasonable for the Director to look elsewhere for guidance, to make a considered choice based on that guidance, and to settle on the prevailing long-standing general rule. By contrast, we have no authority to force the Director to apply a different choice that conflicts with the agency's long-standing default rule—especially given that the governing statute provides no support for such a judicial mandate.[2] Cf. *Newport News*, 514 U.S. at 135-36.

---

[2]The majority also suggests that we can tell that simple interest is unreasonable because the Board has indicated that compound interest might be warranted in exceptional circumstances. Op. at 10480-81. But compounding interest in exceptional circumstances, such as when a party engages in willful misbehavior, accords with the general rule giving trial judges discretion to select an interest award within a range of reasonable options. *See W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1288-89 (9th Cir. 1984); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (concluding that compound interest was appropriate where the violation of federal law was "intentional, and indeed outrageous" and where the appellant had engaged in dilatory tactics); *cf. also NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 348-49 (1953) (eschewing the "debate about what is 'remedial' and what is 'punitive' " and instead noting that a proper remedy should be formulated with the unique circumstances of the case in mind). Though we deal with prejudgment interest rather than post-judgment interest, the distinction, as the majority notes, "carries no significance here." Op. at 10476.

D

The majority's failure to defer under *Skidmore* to the Director's long-standing position is made all the more perplexing by its determination that the Director's selection of the proper interest rate *is* entitled to *Skidmore* deference. The majority acknowledges that, because the LHWCA is silent on interest, the selection of interest rate is "in large part a policy determination best left to the agency." Op. at 10473-74. The majority concludes that the Director's selection of the section 1961 rate is "consistent with the statutory framework" and that there are "[n]o clearer alternatives . . . within our authority or expertise to adopt." Op. at 10474. But the rate of interest *and* the method of computing it have each been consistently applied by the Director and the Board for over 20 years and have been contained within the Director's manual for nearly as long. It is hardly reasonable to accept the one and to reject the other when the same reasoning supports both.

II

Proper application of *Skidmore* requires us to defer to the Director's long-standing, consistent practice of awarding simple interest, recognizing that the Director is in the best position to determine whether, as a policy matter, the method of computing interest should be changed better to align with modern circumstances.

For the foregoing reasons, I respectfully dissent.