**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RONALD FOURNIER,
*Plaintiff*,

and

DELORES BERG; THOMAS DiCECCO,
JR.,
*Plaintiffs-Appellants*,

v.

KATHLEEN SEBELIUS, Secretary of
the Department of Health and
Human Services,
*Defendant-Appellee*.

No. 12-15478

D.C. No.
2:08-cv-02309-
ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Chief District Judge, Presiding

Argued and Submitted
March 5, 2013—Pasadena, California

Filed May 31, 2013

Before: Alfred T. Goodwin, Kim McLane Wardlaw,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

---

**SUMMARY**[*]

---

**Medicare**

The panel affirmed the district court's judgment affirming
the Secretary of Health and Human Services' decisions
denying plaintiffs' claims for Medicare coverage for dental
services.

Plaintiffs are Medicare beneficiaries who suffer from
medical conditions that caused significant dental problems,
and they received dental services to correct those problems.
The panel held that the Medicare Act under which the
Secretary denied coverage was ambiguous on the question
plaintiffs raised. The panel further held that *Chevron*
deference applied, and the Secretary's interpretation of the
statute was reasonable. Finally, the panel held that the
Secretary's denial of coverage did not violate plaintiffs' equal
protection rights under the Fifth Amendment.

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

**COUNSEL**

Gill Deford (argued), Wey-Wey Kwok, Alice Bers, Center for Medicare Advocacy, Inc., Willimantic, Connecticut, for Plaintiffs-Appellants.

Sushma Soni (argued), Attorney, Civil Division, Stuart F. Delery, Acting Assistant Attorney General, Dennis K. Burke, United States Attorney, Michael S. Raab, Attorney, Civil Division, United States Department of Justice, Washington, D.C., for Defendant-Appellee.

Ruth Szanto, Arizona Center for Disability Law, Phoenix, Arizona, for Amici Curiae.

**OPINION**

GOULD, Circuit Judge:

Appellants Delores Berg and Thomas DiCecco are Medicare beneficiaries who suffer from medical conditions that caused significant dental problems, and they received dental services to correct those problems. But the Secretary of the Department of Health and Human Services (HHS) denied coverage for those services. Appellants contend that this denial was premised on the Secretary's unreasonable interpretation of the Medicare Act, which contravenes the intent of Congress and violates Appellants' right to equal protection under the Fifth Amendment. We affirm the district court, holding (1) that the statute under which the Secretary denied coverage is ambiguous on the question Appellants raise; (2) that *Chevron* deference applies; (3) that the Secretary's interpretation of the statute is reasonable; and (4)

that the denial does not violate Appellants' Fifth Amendment rights.[1]

# I

Berg is a Medicare Advantage beneficiary. She suffers from Sjogren's Syndrome, which has left her unable to produce saliva. As a result, she lost teeth, her gums deteriorated, and her bite collapsed. Berg's lack of saliva made her prone to gum infections, which put her at risk of a life-threatening heart infection. In response to the grave conditions and risks caused by Sjogren's syndrome, Berg's dentist recommended a treatment plan that would "develop and reconstruct a leveled bite," with procedures including a partial denture, several crowns, and bridgework. Berg underwent the recommended procedures on February 27, 2008, at a total cost of $28,750.00.

Berg submitted a claim for these services to her Medicare Advantage provider. Her provider denied the claim because Berg was enrolled in a plan that did not cover "[r]outine dental care (such as cleanings, fillings, or dentures) or other dental services." Berg's provider sent her appeal to an independent outside review entity, which told Berg that the dental services related to Sjogren's syndrome do not fall within the limited dental coverage of her Medicare Advantage plan and denied her appeal. Berg then appealed to an

---

[1] Appellants do not directly challenge the Secretary's final decision on their individual claims for benefits but instead challenge the policy leading to those unfavorable rulings. Because we affirm the district court on both of Appellants' substantive claims, we need not and do not reach their claim that the district court erred in concluding that putative class members did not qualify for waiver of exhaustion of administrative remedies.

Administrative Law Judge ("ALJ"), who ruled that the services Berg received were excluded by Medicare's dental-services exclusion. Although the plan representatives and the ALJ acknowledged that Berg's dental problems stemmed from her Sjogren's syndrome, the ALJ concluded that the services at issue did not fall under any exception to the dental exclusion because Berg's "dental work was the primary procedure, rather than necessary to or incident to any Medicare covered procedure." The Medicare Appeals Council ("MAC") adopted the ALJ's decision and denied Berg's appeal, explaining, "Services performed in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth are not covered and, to the extent coverage is provided, it is only under limited circumstances not applicable to this case."

Thomas DiCecco, Jr., is a Medicare beneficiary under Parts A and B. In 1996, several years before becoming eligible for Medicare, DiCecco received an allogeneic bone-marrow transplant to treat chronic myelogenous leukemia. He received a donor lymphocyte infusion in June 1999. As a result of these treatments, DiCecco developed graft-versus-host disease, with a resulting loss of salivary function. As it did with Berg, DiCecco's lack of saliva led to tooth loss. DiCecco's tooth decay was so severe that it caused "certain teeth to just crack off," and forced him to use a feeding tube for nearly a year. More than a decade after DiCecco's bone-marrow transplant, his dentist prescribed a course of treatment, responding to the graft-versus-host disease with frequent examinations and restorative dental work such as fillings and crowns. DiCecco had this treatment from April to July 2008. DiCecco then submitted a claim for reimbursement for resin, crown, and fluoride treatments to his Medicare Part B contractor. His contractor denied the claim

in full, and an independent contractor upheld the denial. DiCecco appealed to an ALJ, who recognized that DiCecco needed the dental care because of his graft-versus-host disease but upheld the denial because "dental services are excluded from Medicare coverage regardless of the medical need for those services." The MAC adopted the ALJ's decision and acknowledged that DiCecco's need for dental services was provoked by a medical condition. But the MAC explained that the relationship between DiCecco's graft-versus-host disease and his dental services does not, by itself, qualify the dental services for Medicare coverage. DiCecco's treatments would be covered only if they were furnished along with a covered procedure that was performed by the dentist on the same occasion.

Berg and DiCecco joined a lawsuit filed by Ronald Fournier, who raised similar claims to those of Berg and of DiCecco.[2] The plaintiffs challenged the MAC decisions, which were the Secretary's final decisions in their cases, and sought declaratory and injunctive relief advocating the views that the Secretary's decision to deny coverage for their extraordinary, medically related dental services violated HHS policy, the Medicare Act, and their right to equal protection. The district court held (1) that substantial evidence supported the Secretary's decisions denying coverage to Berg and DiCecco, (2) that the Secretary's statutory interpretation excluding coverage was reasonable, and (3) that the Secretary's policy does not violate the equal protection guarantee in the Fifth Amendment's due process clause. This appeal followed.

---

[2] Fournier received a favorable ruling from an ALJ before the district court issued its order, so Fournier's claims were dismissed as moot. *Fournier v. Sebelius*, 839 F. Supp. 2d 1077, 1081 (D. Ariz. 2012).

## II

This appeal centers on the broad exclusion of dental services from Medicare coverage, so we discuss the development of that exclusion. Congress established Medicare in 1965 as Title XVIII of the Social Security Act ("Medicare Act"). Pub. L. No. 89-97, 79 Stat. 286 (1965). Medicare provides medical services to (1) the aged, (2) the disabled, and (3) those who have end-stage renal (kidney) disease. 42 U.S.C. § 1395c. The Secretary of Health and Human Services administers the program, and she has authority to prescribe necessary regulations, § 1395hh(a)(1), and determine which claims will be covered, § 1395ff(a). The Secretary may issue National Coverage Determinations to define what services are considered reasonable and necessary. § 1395ff(f)(1)(B).

Medicare provides institutional care, including inpatient hospital services, through Part A, § 1395d(a), and authorizes payment for supplemental and outpatient services in Part B, § 1395k. Part C, known as Medicare Advantage, allows beneficiaries to receive services authorized under Parts A and B through managed-care or fee-for-service plans. § 1395w-22(a)(1)(A), (a)(1)(B)(i).

Medicare coverage is broadly limited to services that are medically "reasonable and necessary." *See* § 1395y(a)(1)(A)–(C). Medicare coverage is also subject to specific restrictions, one of which, prominent here, excludes most dental services from reimbursement. That exclusion denies payment for any expenses incurred:

> for services in connection with the care, treatment, filling, removal, or replacement of

teeth or structures directly supporting teeth, except that payment may be made under part A of this subchapter in the case of inpatient hospital services in connection with the provision of such dental services if the individual, because of his underlying medical condition and clinical status or because of the severity of the dental procedure, requires hospitalization in connection with the provision of such services;

§ 1395y(a)(12). The exclusion, without the exception for inpatient services under Part A, was included in the initial form of the Medicare Act. *See* Pub. L. No. 89-97, § 1862(a)(12), 79 Stat. 286, 325 (1965). The Senate Report accompanying the Medicare Act said that this exclusion was intended "to make clear that the services of dental surgeons covered under the bill are restricted to complex surgical procedures" and that "routine dental treatment—filling, removal, or replacement of teeth or treatment of structures directly supporting the teeth—would not be covered." S. Rep. No. 89-404, at 49 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1989–90. This explanation moves us towards the core of the problem presented on this appeal. When the Secretary first promulgated regulations under the dental exclusion in § 1395y(a)(12), she added the word "routine" to the statutory exclusion, excluding coverage for "[r]outine dental services in connection with the care, treatment, filling, removal, or replacement of teeth, or structures directly supporting the teeth." 31 Fed. Reg. 13534, 13535 (Oct. 20, 1966).

Congress also limited coverage for dental services in a second way: by restricting the definition of "physician." The

Medicare Act distinguished between complex, covered dental procedures and common, excluded procedures by defining "physician" to include dentists and oral surgeons only when they performed "(A) surgery related to the jaw or any structure contiguous to the jaw or (B) the reduction of any fracture of the jaw or any facial bone." Pub. L. No. 89-97, § 1861(r)(2), 79 Stat. 286, 321 (1965).

Covered services, such as surgery related to the jaw, often require individual procedures, such as tooth removal, that standing alone would not be covered as primary procedures. As a result, the Secretary needed to determine when a dental service was provided "in connection with" a covered primary procedure such that the dental service would be covered. Shortly after passage of the Medicare Act, the Director of the Bureau of Health Insurance answered this question in policy guidance to clarify the coverage of secondary dental services in his Intermediary Letter No. 193 of January 30, 1967.

The Director reasoned that because a dentist was defined as a "physician" only when performing surgery "related to the jaw or structures contiguous to the jaw (including the reduction of any fracture of the jaw or any facial bone), all such surgical procedures performed by a dentist" would be covered unless specifically excluded. By contrast, any services rendered in connection with the examination, care, treatment, filling, removal, or replacement of teeth and any services rendered in connection with the examination, care, or treatment of structures directly supporting the teeth were excluded.[3] The Director explained that Medicare would

---

[3] According to the Secretary, "'[s]tructures directly supporting the teeth' means the periodontium, which includes the gingivae, dentogingival junction, periodontal membrane, cementum of the teeth, and alveolar

cover these procedures when performed on the same occasion by a dentist "as an incident to and as an integral part of a covered procedure or service *performed by him*." If an excluded service were the primary procedure, however, that procedure and any adjuncts "would not be covered regardless of the complexity or difficulty of the procedure." This is known as the "same physician rule."[4]   *See Wood v. Thompson*, 246 F.3d 1026, 1030 (7th Cir. 2001).

Congress revisited the exclusion of primary dental services in 1972, when it amended § 1395y(a)(12) to give coverage for dental services "under part A in the case of inpatient hospital services in connection with a dental procedure where the individual suffers from impairments of such severity as to require hospitalization." Pub. L. No. 92-603, § 256(c), 86 Stat. 1329, 1447 (1972). The next year, Congress again amended this subsection to clarify the coverage of inpatient dental services, allowing coverage only if the patient's "underlying medical condition and clinical status require[d] hospitalization in connection with the provision of such services." Pub. L. No. 93-233, § 18(k)(3),

---

process." Centers for Medicare & Medicaid Servs., Publ'n No. 100-02, *Medicare Benefit Policy Manual*, ch. 15, § 150, at 134.

[4] The same-physician rule is often described as an exception to the exclusion of coverage for dental procedures as primary services under 42 U.S.C. § 1395y(a)(12). *See Fournier v. Sebelius*, 839 F. Supp. 2d 1077, 1081 (D. Ariz. 2012) ("[T]to be covered by [the] exception, the dental services would have to be furnished along with another covered procedure *performed by the dentist on the same occasion*.") (quoting the MAC). Section 1395y(a)(12), however, excludes coverage for services "in connection" with dental services. It does not provide, limit, or consider dental services that are provided "in connection" with services "furnished as an incident to a physician's professional service" as defined in 42 U.S.C. § 1395x(s)(2)(A).

87 Stat. 947, 970 (1973). In response to these amendments, the Secretary issued a new regulation "[t]o conform the regulatory language regarding hospital admissions for excluded dental services with the statutory language." 39 Fed. Reg. 28622, 28623 (Aug. 9, 1974). This 1974 revision removed the word "routine" from the coverage exclusion and noted that the 1973 statutory amendment, Pub. L. 93-233, § 18(k), "confirmed the substantive position taken in the proposed regulations." *Id.*; *see also* 42 C.F.R. § 411.15(i).

In 1980, Congress amended the Medicare Act to expand the role of dentists in two ways. First, the definition of "physician" was amended to include "a doctor of dental surgery or of dental medicine who is legally authorized to practice dentistry by the State in which he performs such function and who is acting within the scope of his license when he performs such functions." Pub. L. No. 96-499, § 936(a), 94 Stat. 2599 (1980); *see also* 42 U.S.C. § 1395x(r). The accompanying House Report stated that "there are some services which are covered under Medicare only if performed by a physician . . . but are not covered when furnished by a dentist." H.R. Rep. No. 96-1167 at 372 (1980), *reprinted at* 1980 U.S.C.C.A.N. 5526, 5735. The amended language "provide[d] the same coverage for services performed by a dentist . . . that is provided for services performed by physicians." *Id*.

Second, Congress granted admitting privileges to dentists and expanded coverage of inpatient dental services. Before the 1980 amendment, inpatient dental services were covered only when a patient was hospitalized for an underlying, nondental condition. *See id*. Coverage was "precluded where, in the judgment of the patient's dentist, the severity of

the dental procedure alone require[d] hospitalization." *Id*. Congress amended the section to cover "hospital stays based on a dentist's (or physician's) certification that hospital inpatient services are necessary for the performance of noncovered dental procedures either because of the severity of the dental procedure or the patient's underlying condition warrants such hospitalization." *Id*. at 5735–36. These changes were meant to bring parity to the role of dentists and provide for greater inpatient dental coverage under Part A, not expand the provision of outpatient dental services under Part B, so the "exclusion of routine dental services . . . remain[ed] in effect." *Id.* at 5735.

These changes to the role of dentists did not change the scope of coverage of dental services on an outpatient basis, and the text of the dental exclusion has not changed since passage, apart from the allowance for inpatient coverage under Part A. *Compare* Pub. L. No. 89-97, § 1862(a)(12), 79 Stat. 286, 325, *with* 42 U.S.C. § 1395y(a)(12). Medicare contractors must still determine whether dental services are provided "in connection" with a covered, primary service. As a result, the same-physician rule remains in effect. The Centers for Medicare and Medicaid Services (CMS) *Medicare Benefit Policy Manual* (CMS Manual) describes the rule in language similar to that found in the 1967 Intermediary Letter No. 193, explaining:

> If an otherwise noncovered procedure or service is performed by a dentist as incident to and as an integral part of a covered procedure or service performed by the dentist, the total service performed by the dentist on such an occasion is covered.

Centers for Medicare & Medicaid Servs., Publ'n No. 100-02, *Medicare Benefit Policy Manual*, ch. 15, § 150, at 134.; *see also id*. ch. 16 § 140.

An exception to the same-physician rule allows for reimbursement of dental services provided in preparation for a covered procedure performed by a different physician: the extraction of teeth to prepare a patient's jaw for radiation treatment of neoplastic disease. *Id.* at ch. 15, § 150. Most often, a dentist will extract the patient's teeth and a radiologist will administer the radiation treatments. *Id*. In a similar situation, Medicare covers dental examinations on an inpatient basis as part of a work-up before kidney transplant surgery. Centers for Medicare & Medicaid Servs., Publ'n No. 100-03, *Medicare National Coverage Determinations Manual*, § 260.6. This examination is only provided on an inpatient basis, so it now likely falls under the general allowance for inpatient services under Part A.[5] In both situations, however, the purpose of the dental procedure is not the care of teeth or structures supporting teeth but the preparation for a subsequent, covered procedure.

### III

We have jurisdiction under 42 U.S.C. §§ 405(g), 1395w-22(g)(5), and 1395ff(b)(1)(A) and 28 U.S.C. § 1291. We review a district court's decision upholding the MAC's

---

[5] This second situation is nevertheless described as an exception or corollary to the same-physician rule. *See Wood*, 246 F.3d at 1030. In addition to the potential provision of this service under Part A, Kidney-transplant surgery is in a unique category under Medicare because end-stage renal disease is the only condition that guarantees Medicare eligibility. *See* 42 U.S.C. § 1395rr.

decisions de novo. *Conahan v. Sebelius*, 659 F.3d 1246, 1249 (9th Cir. 2011). We review de novo a district court's constitutional rulings, *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1133 (9th Cir. 2011), as well as its decisions on questions of statutory interpretation, *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1095 (9th Cir. 2005).

## IV

Appellants contest the MAC's rulings denying coverage for their dental services by challenging the Secretary's underlying policy decision to exclude dental procedures that are not performed at the same time and by the same dentist as a covered procedure. Appellants contend (1) that the Secretary has not carried out Congress's intent to cover complex surgical procedures and (2) that the Secretary's coverage policy is irrational and thus violates the equal protection component of the Due Process Clause of the Fifth Amendment. We consider first statutory interpretation, and then the constitutional challenge.

## A

When we review an agency's interpretation of a statute that it is charged with administering, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But if "the statute is silent or ambiguous with respect to the specific issue," we will not "impose [our] own construction on the

statute." *Id.* at 843. Instead, we ask "whether the agency's answer is based on a permissible construction of the statute." *Id*. If the agency's construction is permissible, we defer to it. *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1164 (9th Cir. 2012).

Before we address whether in the statute Congress has spoken clearly, we must identify the precise question at issue. Appellants do not allege that they received dental services in connection with a covered procedure. Because they do not, the same-physician rule does not come into play, and any ambiguity in the Secretary's implementation of that rule is not relevant here.[6]

Appellants also do not allege that they received dental care on an inpatient basis, and they do not seek reimbursement under Part A. As a result, they do not qualify for § 1395y(a)(12)'s inpatient exception. Appellants received outpatient services and sought reimbursement under Part B, so they cannot benefit from the coverage rules provided for inpatient care under Part A. *Accord Chipman v. Shalala*, 90 F.3d 421, 422–23 (10th Cir. 1996). Any ambiguity in the inpatient-coverage provision does not reach Appellants.

Appellants are in a third category. They received primary dental services on an outpatient basis and sought coverage under Part B. Appellants contend that those services should be covered because they were "medically necessary" to

---

[6] One of our sister circuits held § 1395y(a)(12) to be ambiguous in that context, *see Wood*, 246 F.3d at 1031–32. After examining the rule, the Seventh Circuit applied *Chevron* deference and concluded that the Secretary's interpretation of the same-physician rule was reasonable. *Id.* at 1035.

prevent potentially fatal heart infections. The Secretary disagrees, arguing that § 1395y(a)(12) unambiguously rejects Appellants' claims: Services "in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth" are excluded from coverage, so primary dental services that are not provided on an inpatient basis are excluded by the statute. According to the Secretary, the relationship between Appellants' services and their risk of infection is irrelevant.

Having distinguished Appellants' situation from related questions about dental coverage under Medicare, we do not think that "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Section 1395y(a)(12) prohibits Medicare coverage of expenses for services "in connection" with the care of the teeth. It is arguable, however, that the Secretary could interpret Appellants' services to have been provided not "in connection with" the care and treatment of teeth, but rather "in connection with" a medical need to prevent life-threatening heart infections. Viewed in this light, the services provided here could plausibly be viewed as either in connection with the care of teeth or with alleviating a symptom caused by a serious prior disease, namely Sjogren's Syndrome or graft-versus-host disease. We can see that there are fair arguments on both sides of the issue and conclude that the statute is ambiguous. Accordingly, we turn to the second step of *Chevron*. *See* 476 U.S. at 843.

## B

Having concluded that § 1395y(a)(12) is ambiguous as to the extent of the dental-services exclusion, we now address whether the Secretary's construction of that exclusion is

reasonable. *See id*. The Secretary did not issue her interpretation through notice-and-comment rulemaking or formal adjudication, so we must first determine what level of deference we should give to her interpretation. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Appellants contend that the Secretary's interpretation of § 1395y(a)(12) does not merit *Chevron* deference because the interpretation, as published in the CMS Manual, does not carry the force of law. Instead, Appellants suggest that the Secretary's interpretation is entitled to respect only to the extent that it has the "power to persuade" under *Skidmore v. Swift & Co.* 323 U.S. 134, 140 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). Under that standard, Appellants believe, the Secretary's interpretation is unpersuasive.

The Secretary agrees that her interpretation in the CMS Manual does not by itself carry the force of law. *See* 42 C.F.R. § 405.1062(a) ("ALJs and the MAC are not bound by . . . manual instructions."). Instead, the Secretary explains that her interpretation deserves *Chevron* deference because the process of adjudication leading to the MAC's decisions was "provided for by Congress" and the Secretary's interpretation was given effect through this "relatively formal administrative procedure." *Mead*, 533 U.S. at 230.

Under *Mead*, we will give *Chevron* deference to an agency's interpretation of a statute "only when: (1) 'it appears that Congress delegated authority to the agency generally to make rules carrying the force of law,' *and* (2) 'the agency interpretation claiming deference was promulgated in the

exercise of that authority.'"  *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 833 (9th Cir. 2012) (en banc) (quoting *Mead*, 533 U.S. at 226–27).

The Secretary's interpretation meets the first prong of the *Mead* test.  The Secretary has general rulemaking authority under § 1395hh(a)(1).  Congress decided that Medicare should pay for reasonable and necessary medical expenses, but it also restricted coverage of outpatient dental care. Congress delegated to the Secretary the authority to "promulgate regulations and make initial determinations with respect to benefits" within the bounds of these provisions. 42 U.S.C. § 1395ff(a).  The authority to promulgate regulations indicates that Congress delegated to the Secretary to make rules carrying the force of law.  *See Mead*, 533 U.S. at 229 (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991) (explaining that we give no *Chevron* deference to agency guideline where congressional delegation did not include the power to "promulgate rules or regulations")).

Addressing the second prong of *Mead*, we ask whether the Secretary's interpretation of the dental exclusion "was promulgated in the exercise of that authority [to make rules carrying the force of law]."  *Id*. at 227.  The answer "depends on the form and context of that interpretation."  *Price*, 697 F.3d at 826.  That the Secretary reached her interpretation "through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due."  *Barnhart v. Walton*, 535 U.S. 212, 221 (2002).  The Secretary's interpretation of the dental exclusion is similar in both form and context to the interpretation given *Chevron* deference in *Barnhart*, *id*. at 225, and we follow *Barnhart* to conclude the

Secretary's interpretation meets the second prong of the *Mead* test.

In *Barnhart*, the Supreme Court reversed a Fourth Circuit decision holding that a section of the Social Security Act forbade the Secretary's interpretation of the meaning of the word "inability" in the definition of "disability." *Id*. at 214. The statute defined "disability" as an "inability to engage in any substantial gainful activity . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (emphasis omitted) (quoting 42 U.S.C. § 423(d)(1)(A)). Under the Secretary's interpretation, this duration requirement was prospective if the inability was ongoing at the time of adjudication. But if an applicant's inability resolved itself in less than 12 months, the applicant would not be found disabled and would receive no benefits, even if the inability were one that initially might have been expected to last that long. *Id*. The Supreme Court first examined and upheld this definition as the agency's interpretation of its own regulation. *Id*. at 217 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

The petitioner in *Barnhart* objected to the Court's application of *Auer*, however, because the regulation in question came into effect long after the agency denied his claim for benefits, possibly in response to the litigation. *Id.* at 221; *see Walton v. Apfel*, 235 F.3d 184, 188 n.6 (4th Cir. 2000), *rev'd sub nom. Barnhart*, 535 U.S. at 221 (the proposed regulation did not apply retroactively). But the Court explained that the agency's long-held interpretation would warrant *Chevron* deference even if it had not been

bolstered by the rulemaking. *Id.*[7] The Court reasoned that "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Barnhart*, 535 U.S. at 222 (citing *Mead*).

The Secretary's interpretation here exhibits those factors. The legal question is interstitial: the dental exclusion "is clear, with clear exceptions," *Wood*, 246 F.3d at 1035, and the Secretary's interpretation fills the interstices dividing the exceptions from the exclusion. The rule limiting coverage is important to the Secretary's administration of Medicare given the scarce resources available and the "vast number of claims that [Medicare] engenders." *Barnhart*, 535 U.S. at 225. That vast number of claims, each of which involves distinct medical facts, speaks also to the complexity of administering Medicare "and the consequent need for agency expertise and administrative experience." *Id.*

The origins and legal contexts of the two interpretations are also similar. The interpretation in *Barnhart* originated in a disability-insurance letter, was later published in a state

---

[7] Appellants contend that this section of *Barnhart* was dicta because the Court decided the outcome under *Auer*. Even if this were true, we afford "considered dicta from the Supreme Court . . . a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold." *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc). Given the similarities between Appellants' situation and *Barnhart*, we choose not to ignore the Supreme Court's reasoned guidance in that case.

disability-insurance manual, and was included in Social Security Ruling 86-52 before being issued as a regulation following notice-and-comment rulemaking. *Id*. at 219–20. Here, the Secretary first issued her interpretation in an intermediary letter and later published it in a manual. Social Security rulings, like interpretations in the CMS Manuals, do not have the force of law; both are interpretative rules constituting the agencies' interpretations of the statutes they administer. *Compare Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996) (Social Security rulings), *with Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 788 (9th Cir. 2003) (CMS Manual provisions). Both gain the force of law through the process of adjudication of a "vast number of claims" under § 405(b). *See* 42 U.S.C. § 1395w-22(g)(5) (incorporating administrative hearing and judicial review provisions of § 405(b) and (g) from Social Security into Medicare); 42 U.S.C. § 1395ff(b)(1)(A) (same).

In *Barnhart*, the Court gave particular weight to the long history and stability of the interpretation in question. The agency in *Barnhart* first adopted its interpretation of "inability" in 1957, and the Court noted that it "will normally accord particular deference to an agency interpretation of 'longstanding' duration." 535 U.S. at 220 (citing *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522, n.12 (1982)). Here, the Secretary first adopted her interpretation of the exclusion of primary dental services in her 1967 Intermediary Letter No. 193. More than eleven years have now passed since the Supreme Court decided *Barnhart*, so the Secretary's interpretation of the dental exclusion is even older than the agency's interpretation of the word "inability" was when the Court decided *Barnhart*. In addition to the weight of years of consistent administrative interpretation, the Secretary's

interpretation of the dental exclusion was issued shortly after passage of the Medicare Act. *See* Health Insurance for the Aged Act, Pub. L. No. 89–97, tit. I, 79 Stat. 290 (1965). Such a nearly contemporaneous construction is entitled to significant deference. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993).

As in *Barnhart*, the Secretary's interpretation of the dental exclusion is a half-century old interpretation given effect through a system of adjudication authorized under § 405(b). Moreover, the Secretary's interpretation shows the same factors deemed critical in *Barnhart*. These similarities "all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the [Secretary's] interpretation here at issue." *Barnhart*, 535 U.S. at 222.

Appellants contend that the Secretary's interpretation has been inconsistent and is "entitled to considerably less deference than a consistently held agency view." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (internal quotation and citation omitted). But when Appellants describe the Secretary's interpretation as inconsistent, they refer not to the challenged interpretation—the policy guidance on outpatient primary dental procedures—but to 42 C.F.R. § 411.15(i), the regulation that paraphrases the statutory dental exclusion in § 1395y(a)(12). In 1974, the Secretary removed the word "routine" from the description of dental services excluded from coverage. The Secretary made that change to accommodate the new exception for inpatient services under Part A. *See* 39 Fed. Reg. 28622, 28623 (Aug. 9, 1974). The policy guidance at issue here did not change; it has been consistent since 1967. As discussed in Section IV(A) above, Appellants' claims do not implicate the same-physician rule or the inpatient exception. Changes to the

Secretary's guidance on those questions do not undermine her interpretation here, and *Cardoza-Fonseca* does not reduce the deference we will give to this long-standing, "consistently held agency view." 480 U.S. at 446 n.30. Like the United States Court of Appeal for the Seventh Circuit in *Wood*, we conclude that the Secretary's interpretation of § 1395y(a)(12) warrants *Chevron* deference. *See* 246 F.3d at 1035.[8]

Having so concluded, and in light of our prior conclusion that the statute is ambiguous, we must decide whether the Secretary's interpretation is a reasonable one. Congress required the Secretary to deny payment for "services in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth" that are not provided on an inpatient basis to hospitalized patients. 42 U.S.C. § 1395y(a)(12). She has done so since 1967 by reading "services in connection with" to refer to services related to dental procedures provided as primary services based on her reasonable definition of "structures directly supporting teeth." In the decades since, "Congress has frequently amended or reenacted the relevant provisions" without altering this exclusion, "provid[ing] further evidence . . . that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible."

---

[8] The Second Circuit considered a different interpretation in a CMS manual without reference to the factors enumerated in *Barnhart*. *Estate of Landers v. Leavitt*, 545 F.3d 98, 106 (2d Cir. 2008). The court there did not apply *Chevron*, but even without considering the *Barnhart* factors or any similarity to the context of the interpretation in *Barnhart*, it recognized that where "CMS, a highly expert agency, administers a large complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference—namely, *Chevron* and *Skidmore*—begin to converge." *Id*. at 107 (quotation and alteration omitted).

*Barnhart*, 535 U.S. at 220 (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845–46 (1986)).

Appellants contend that the legislative history of § 1395y(a)(12) contradicts the dental exclusion's plain language and makes the Secretary's interpretation unreasonable. The Senate Report accompanying the Medicare Act expressed the desire to provide coverage for "complex surgical procedures." *See* S. Rep. No. 89-404, at 49. House and Senate reports describe the excluded coverage as "routine" dental care, which Appellants believe does not include their "extensive, medically related procedures." *See, e.g.*, *id*. When a statute is plain on its face, "we ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 n.29 (1978). Because we have concluded that the statutory dental exclusion is ambiguous, legislative history permissibly may be considered. But we conclude that the legislative history more amply supports the agency's argument than that of the Appellants. The second part of § 1395y(a)(12) gives coverage under Part A for inpatient dental services when a patient requires hospitalization because of the severity of the required procedure. An exception for inpatient services is perhaps not the only way to provide for coverage for dental work that is part of a complex surgical procedure and non-routine care, but it is the one that Congress chose. The statute does not compel the Secretary to cover dental work that is related to complex procedures under Part B. The text of § 1395y(a)(12) does not indicate that there need be further exceptions beyond those for inpatient care and the same-physician rule. We conclude that the Secretary's interpretation is reasonable and therefore permissible.

**V**

Appellants contend that the Secretary's coverage rules for dental services create irrational classifications and violate their right to equal protection under the Fifth Amendment. The "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Equal protection "does not forbid classifications." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Romer*, 517 U.S. at 631. Appellants concede that the classification they challenge is subject to the rational basis test, under which we will uphold a classificatory scheme if it "bears a rational relation to some legitimate end." *Id*. Under this standard, Appellants "'have the burden to negat[e] every conceivable basis which might support it.'" *Diaz v. Brewer*, 676 F.3d 823, 826 (9th Cir. 2012) (quoting *FCC v. Beach Commc'ns, Inc*., 508 U.S. 307, 315 (1993)).

Appellants assert that the "favored classes" of (1) patients who receive their dental services on the same day and from the same physician who provided a covered service, (2) patients who need extractions of teeth to prepare the jaw for radiation treatment, and (3) patients who require a comprehensive dental workup before a kidney transplant do not collectively demonstrate any logical principle. But each of these "favored classes" describes patients with undoubtedly covered primary procedures who receive dental treatment in connection with those covered procedures. By contrast, Appellants' primary procedures were noncovered

dental treatments. Appellants concede that the goal of limiting coverage is a legitimate governmental objective, and the distinction here is rationally related to that goal. Moreover, because their dental treatments were not ancillary to a covered procedure, Appellants are not similarly situated to the "favored classes" they cite. "Evidence of different treatment of unlike groups does not support an equal protection claim," *Wright*, 665 F.3d at 1140 (quoting *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005)). We conclude that there is no violation of the Constitution's guarantee of equal protection.

## VI

Appellants' illnesses, Sjogren's Syndrome and graft-versus-host disease, are serious, and the conditions that these diseases present strongly require dental treatment to maintain a patient's health against catastrophic health risks. The claims of Appellants are sympathetic, and their desire for coverage is understandable. But not all medically necessary services are covered by Medicare, and the Secretary has implemented a coverage framework consistent with the goals of Congress that there be broad denial of coverage for dental services. Although we have concluded that the statutory provision for exclusion of dental services is ambiguous in the sense that plausible divergent constructions can be urged, we also conclude that the Secretary's interpretation of the statute is reasonable. The underlying conditions of Sjogren's Syndrome and graft-versus-host disease are complex, but the consequent need is for dental services that are routine in the sense that they are not different from services commonly given others, that is, preparation and application of crowns, bridgework, and fillings. In light of this comprehensive and specific legislative command, which broadly excludes

primary dental services from Medicare coverage, we have concluded both that the Secretary's statutory interpretation warrants *Chevron* deference, and that the Secretary's statutory interpretation is reasonable.

**AFFIRMED**.